ROBERT W. MESERVE, special administrator, vs. JORDAN
MARSH COMPANY
(and a companion case[1]).

Suffolk.    March 8, 1960. — April 6, 1960.

Present: WILKINS, C.J., SPALDING, WILLIAMS, COUNIHAN, & CUTTER, JJ.

*Unsound Mind. Landlord and Tenant,* Rescission of lease. *Equity Juris-
diction,* Rescission.

The evidence in a suit in equity for rescission of a long term lease of
   valuable business property on the ground of mental incapacity of the
   lessor, an elderly man, although it tended to show physical and mental
   deterioration of the lessor culminating in the appointment of a con-
   servator for him a few years after the making of the lease, that he
   negotiated the terms of the lease himself without advice other than
   casual assistance from a representative of a mortgagee of the property,
   and that the terms of the lease might have been more favorable to him,
   did not show to be plainly wrong the trial judge's conclusion that the
   lessor had the "mental capacity" to negotiate and enter into the lease,
   understood its terms and "was satisfied with it," and was not over-
   reached by anyone, nor show error in a final decree dismissing the bill.

TWO BILLS IN EQUITY, filed in the Superior Court on
November 26, 1954, and May 23, 1955, respectively.

The suits were heard by *Goldberg, J.*

*Robert W. Meserve, (Jerry M. Brown & Frederick S. Paul-
sen* with him,) for Meserve.

*Philip B. Buzzell, (Charles M. Ewing* with him,) for
Jordan Marsh Company.

*Arthur J. Martin,* for Craig and others, submitted a brief.

CUTTER, J.  In 1951, the Dowling Block, "a 100% loca-
tion" in the business section of Malden, was owned by
Jewell A. Dowling, except for a portion (Lot A) owned by
Dowling as trustee of a trust under his father's will.  On
June 14, 1951, when Dowling was nearly seventy-five, he

---

[1] The companion case is Charles C. Craig & another, trustees, vs. Robert W.
Meserve, special administrator, & another.

executed as trustee and individually a lease to F. N. Joslin Company (Joslin) of the whole block for a term of fifty years at an annual net rental of $35,000. The lessee could terminate the lease unless by July 1, 1952, a Probate Court decree should establish Dowling's authority to lease Lot A. On June 8, 1954, Mr. Meserve, an attorney, was appointed Massachusetts conservator of Dowling's property. On November 26, 1954, he filed a bill in equity against Jordan Marsh Company (Jordan), with which Joslin had been consolidated, to obtain rescission of the lease and other relief on the ground that on June 14, 1951, Dowling was "mentally incompetent." After Dowling's death in 1955, Mr. Meserve as special administrator was substituted as plaintiff. The case was tried together with a bill in equity brought by Dowling's two successors (the successor trustees) as trustees seeking rescission of the lease and reconveyance of Lot A to the trustees. Lot A had been conveyed by Dowling as trustee to himself individually on February 21, 1952, by a deed reciting that the consideration was $202,000 "paid."

The trial judge found that in June, 1951, Dowling "had the mental capacity to make that particular lease; that he knew and understood . . . [its] contents . . . and was satisfied with it; . . . that he had the mental capacity to negotiate with respect to the lease and to take care of his personal interests and to get what he wanted; that no one took advantage of him; and that there was no undue influence, imposition, or misrepresentation." In the case brought by the successor trustees, the judge found that "Dowling was guilty of a breach of trust in paying for Lot A . . . with his personal note . . . that neither Jordan . . . and . . . Joslin . . . nor their attorneys knew of this breach of trust," but that "they relied on the statement in the deed that" the $202,000 was paid by Dowling. The judge also found that on June 14, 1951, "the net rental value of Lot A was" $8,000 a year.

Mr. Meserve has appealed from a final decree dismissing his bill. A final decree was entered upon the successor trust-

ees' bill directing the reconveyance of Lot A to them and awarding them their share of the rent accrued from Dowling's death to January 1, 1959, with interest. It further directed that $8,000 per year, in quarterly instalments, be paid from and after January 1, 1959, to the successor trustees from the rent under the lease, which was not set aside by the decree. From this decree also Mr. Meserve has appealed. The successor trustees have waived their appeal.

The evidence is reported. The scope of our review is that stated in *Lowell Bar Assn.* v. *Loeb*, 315 Mass. 176, 178.

1. The rule as to avoiding transactions because of mental incapacity was stated in *Reed* v. *Mattapan Deposit & Trust Co.* 198 Mass. 306, 314, as follows: "[T]he true test is, was the party whose contract it is sought to avoid in such a state of insanity at the time as to render him incapable of transacting the business. When this fact is established the contract is voidable . . . and it is no defense . . . that the other party acted fairly and without knowledge of his unsoundness or of any circumstances which ought to have put him on inquiry." In *Sutcliffe* v. *Heatley*, 232 Mass. 231, 232–233, this court set aside the transaction of an alleged incompetent, saying, "If she could not understand the nature and quality of the transaction or grasp its significance, then it was not the act of a person of sound mind. There may be intellectual weakness not amounting to lack of power to comprehend. But an inability to realize the true purport of the matter in hand is equivalent to mental incapacity." See *Hermanson* v. *Seppala*, 255 Mass. 607, 609–610; *S. C.* 272 Mass. 197, 200–202; *McNally* v. *Clare*, 281 Mass. 82, 84; *Wodell* v. *John Hancock Mut. Life Ins. Co.* 320 Mass. 1, 3; *Kressler* v. *Flynn*, 323 Mass. 610, 611, and cases cited.

2. Mr. Meserve argues that Dowling's incapacity is shown by the "shocking inadequacy of the consideration received by . . . Dowling under the lease," by his ineffective efforts at negotiation, by his conduct of other transactions, by medical testimony, and by Dowling's personal and medical history. The evidence has been examined to determine

whether the judge's findings were plainly wrong and his conclusions improper, giving them due weight.

In 1934, Dowling was in a hospital because of a spontaneous subarachnoid hemorrhage. In 1940, when he was sixty-four, he suffered a cerebral accident and was hospitalized for twenty-one days. He recovered gradually although, after 1940, he suffered from paralysis of the right side, walked with difficulty, and needed assistance. He showed from then on symptoms of arteriosclerosis and high blood pressure. He became more intensely stubborn, opinionated, and quick tempered. Although he could carry on conversations intelligibly, he became repetitive and talkative, and sometimes forgetful, particularly about recent events. He "was not as sharp in the . . . years . . . around 1948 to 1952 — as he previously had been. He had changed in his dress, in his habits, which a man of . . . normal mental capacity would not do," in the opinion of his family physician. He continued, however, to participate to some extent in managing certain properties, with the assistance of employees, even during and after the period of the lease negotiations. As the judge found, prior "to 1940, Dowling was a neat dresser. A few years later he became careless in his dress. He was physically unable to . . . control . . . his bladder, and he began wearing khaki pants which were frequently stained . . . . On some occasions he . . . [relieved himself] in a public street alongside of his car and on several occasions in a chair."

Dowling's mental deterioration became sufficiently pronounced in 1954 to require the appointment of a receiver of his Florida property and a conservator in Massachusetts. The first time, however, that a physician, who saw him frequently, made a notation that Dowling had "slipped mentally" was October, 1952. The testimony of two qualified medical expert witnesses revealed conflicting opinions about his mental condition in 1951. The whole testimony thus presented the issue of fact whether Dowling had so deteriorated by June 14, 1951, as to render him incapable of understanding "the nature and quality of the transaction"

in contrast with "intellectual weakness not amounting to lack of power to comprehend." See *Sutcliffe* v. *Heatley*, 232 Mass. 231, 232, *supra*.

The judge found that "Dowling was a wealthy man and . . . a liberal spender. He . . . spent considerable money in maintaining two boats. He had no one dependent upon him. He never had any children. In . . . 1951, his wife owned" assets worth more than $147,000, and had a personal income from securities, before taxes, of $11,521. In addition to the Malden property, Dowling owned real estate in Miami (gross rental, $53,000) and in Allston (gross rental, $28,000). These findings were justified, but there was also evidence that Dowling maintained the two boats, one at least in bad shape, principally because it gave him "pleasure to see them tied up at the dock."

After making the 1951 lease he had to borrow $30,000 from a bank. Some of his real estate was substantially mortgaged. His liquid cash position was poor. His expenditures rose and his income after taxes declined. By the end of 1952 he had also borrowed $20,457.65 from Mrs. Dowling and owed $22,626.91 in delinquent taxes. Mrs. Dowling thought her husband was "in an awful condition" and "was complaining bitterly . . . that he should have a conservator," but the evidence indicated that he and Mrs. Dowling had led a somewhat unhappy relationship for a considerable period. She was declared incompetent herself later.

With respect to the lease negotiations the judge found the following facts among others. Joslin was owned by Allied Stores Corporation (Allied). It had occupied part of the block as a department store under two successive leases, the second for a term of ten years expiring in 1953. Early in 1951, Puckett, chief executive of Allied, told Brett, Joslin's manager, that "a long-term lease should be negotiated or a new location . . . obtained, or . . . the store . . . liquidated." Brett talked with one Gilman, president of the Malden Savings Bank which held a mortgage then overdue (principal balance, $568,333.02 as of June 14, 1951) on the portion of the block owned by Dowling. Gilman "had been

advising Dowling in financial matters." Gilman "went to Miami [where Dowling spent the winter months, November to May]. . . . He told Dowling that . . . Joslin . . . wanted to expand . . . and build . . . and was willing to buy the block or take a long-term lease." Dowling would not sell and Gilman "told Brett that Dowling would consider a ground rental."

On June 8, 1951, Dowling, Gilman, Puckett, Brett, and a representative of Jordan conferred in Malden. Puckett said he was interested only in major construction, that "several hundred thousand dollars of new fixtures and equipment would be required and that the lease would have to be for a long term. Dowling said he didn't have money for major construction and . . . wouldn't put any money in at his age" and "wouldn't sell because of the capital gain tax." He also said "he would like to be free from dealing with a number of tenants and would like Joslin . . . to take over the whole block." An appraisal of the property ($1,300,000) "was discussed and Puckett said that it was too high and that a return ought to be considered on a basis of a million dollar appraisal. He offered a $2\frac{1}{2}\%$ net rent . . . and then $3\%$. Gilman advised Dowling not to take it. Puckett asked Dowling if he would take $35,000 net rent and Dowling said he would consider it. The next day Dowling telephoned Brett that he would take $35,000. Dowling understood that net rental meant that the lessee would pay taxes [other than his own income taxes] and all other charges except interest . . . and . . . principal on the mortgage." The "trust property was discussed. Puckett said . . . that the title would have to be worked out to the satisfaction of the [lessee's] lawyers . . . or the deal would be off."

The lessee's attorneys, with assistance from Mr. Plummer, attorney for the Malden Savings Bank, drafted the lease. This was executed on June 14. The savings bank reduced the mortgage interest to $3\frac{1}{2}\%$ and subordinated its mortgage to the lease. On January 29, 1952, a decree of the Probate Court authorized Dowling to sell Lot A to himself

for $202,000 and "to invest . . . the proceeds . . . according to law." On advice of Mr. Plummer Lot A was "paid for by Dowling's personal note," dated February 29, 1952, bearing no interest during Dowling's life because he was life beneficiary of the trust. Counsel for Joslin did not know that the note had been "given . . . for Lot A until some time in 1955." In 1953 and 1954, Allied spent $573,065 in structural changes and $417,932 for equipment and fixtures.

The judge found the "fair market value of the" block just prior to the lease was about $1,000,000. The net assessment (after abatements) was $984,900. This had risen to $1,419,800 by 1956. The Malden tax rate increased from $44.60 in 1947 to $64.60 in 1956. It was $51.60 in 1951. Prior to the lease the trend of Joslin's "business was downward and . . . had fallen off . . . ." The net income of the block just prior to June, 1951, "before depreciation and interest on the mortgage, was about $82,000."

The following evidence seems of significance. Gilman participated in the 1951 lease situation, without compensation from Allied or Dowling, "representing the mortgagee" and also "assisting . . . Dowling wherein . . . [he] could." Neither Gilman nor Dowling consulted one Nessen who had been doing most of the work of management prior to the lease. Nessen ceased to work for Dowling when he learned of the lease. Allied, during the negotiations, was represented by Boston counsel. Dowling was not represented by any lawyer, except that Mr. Plummer, counsel for the savings bank, was called in after the negotiations had been completed to assist in drafting the lease, to straighten out the situation with respect to Lot A, and to draw wills for Dowling and his wife. So far as Mr. Plummer was "concerned the [lease] terms were all settled, and . . . [he] was told what they were." He never got around to sending a bill to Dowling.

There was seriously conflicting evidence about how accurately Dowling understood the terms of the lease. The judge obviously did not believe some of this testimony.

Those present at the negotiations thought Dowling knew what he wanted and that he understood what was being discussed, although Mr. Plummer noticed Dowling's physical weakness and thought that he tended to tire easily and to get off the subject in hand.

The deal, as the trial judge found, resulted in a serious reduction in Dowling's income before income taxes. Dowling, however, had no assurance that, if he did not make the lease, Joslin would continue in the premises. He did not want to rehabilitate the "terribly run-down physical plant" himself. Even if the lease did not require Joslin to make the expenditures, he had every reason to suppose that enlightened self interest would force these permanent improvements. He wanted to be relieved of management problems. He was old and sick and his wife was his only close relative. She had some independent means. Doubtless, although this does not appear to have been discussed, the reduction in Dowling's income was accompanied by a substantial reduction in his later Federal income taxes, so that the whole burden of the reduction of his gross income did not fall on him.

Because of the risks of inflation, many owners would have sought either periodic upward readjustments of rent or some percentage rent provision. Dowling, of course, had little incentive to look at the matter from a long range viewpoint. He had, however, no competent advice in negotiating, other than casual help from Gilman, admittedly primarily interested from the standpoint of the savings bank. The case thus is not one where a person of possibly impaired talents has been represented by competent, independent counsel. Cf. *Willett* v. *Webster*, 337 Mass. 98, 102–103. Mr. Plummer assumed no responsibility for the lease terms.

We have viewed the rent as low and as probably providing an inadequate return on the fair market value of the property. This value, on widely varying appraisals, the judge was justified in finding to be about $1,000,000. Dowling also certainly left himself unprotected (except possibly by oral assurances) from a substantial increase in the interest

payable under an overdue mortgage. Such an increase would have reduced or eliminated his share of the rent. This record shows no such increase. Despite various circumstances unfavorable to Dowling's trading position, we assume that a better negotiator could have won a more favorable lease and that Dowling himself would have done better advised by a competent, independent lawyer, real estate man, or accountant. The record, however, does not convince us that the trial judge was wrong, on evidence largely oral, in his conclusion that Dowling "had the mental capacity to make that particular lease . . . understood what he was to get . . . and was satisfied with it." Giving due weight to the findings of the judge (*Murphy* v. *Hanlon,* 322 Mass. 683, 685), we do not reach a different conclusion.

The judge was justified in concluding that "there was no undue influence, imposition, or misrepresentation." Undoubtedly, Puckett was trying to get the best lease he could and Gilman was interested in protecting his bank's mortgage position. The facts, however, are that Joslin made an offer to Dowling, which he had the capacity to understand, that the Joslin representatives advanced fairly the trading points they had, and that Dowling weighed them and accepted the offer.

Dowling undoubtedly handled other matters ineptly and foolishly during this period. He dealt with business papers sent to him in Florida in dilatory fashion. Some of his business actions seem, at the least, careless. All these matters have been considered.

3. The waiver of the successor trustees' appeal from the final decree in the case initiated by them, and Mr. Meserve's decision not to argue any points connected with that case, make it unnecessary to review that decree beyond its modification (as requested by Mr. Meserve at the arguments) to require the return to Dowling's estate of Dowling's note for $202,000 upon the reconveyance of Lot A to the successor trustees and the payment to them of the sums to be paid to them in accordance with the decree. No question whether there was necessity of joining Dowling's heirs or devisees as

parties in the suit brought by the trustees has been argued. With the single modification noted above, each of the final decrees is affirmed.

*So ordered.*