FRANCES M. SPARROW *vs.* DAVID D. DEMONICO & another.[1]

Middlesex. September 7, 2011. - January 13, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Contract,* Settlement agreement, Incapacity. *Evidence,* Expert opinion. *Mental Health. Witness,* Expert.

Discussion of the historical development of the decisional law of contractual incapacity and the adoption of the modern, "affective" test. [327-330]

Statement that medical evidence is necessary to establish that a person lacked the capacity to contract due to the existence of a medical condition. [330-333]

A Superior Court judge erred in denying the motion of a plaintiff in a civil action to enforce a settlement agreement, in which the defendants sought to avoid enforcement on grounds of contractual incapacity of one defendant, where, given the lack of medical evidence, i.e., expert or medical testimony to explain the effect of the defendant's experiences or behavior on her ability to understand the agreement, to appreciate what was happening, or to comprehend the reasonableness of the settlement terms or the consequences to her authorizing the settlement, there was no basis to conclude that the defendant lacked the capacity to contract. [333-334]

CIVIL ACTION commenced in the Superior Court Department on July 24, 2003.

A motion to confirm a settlement agreement, filed on May 21, 2009, was heard by *Bruce R. Henry,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Kevin B. Nugent* for David D. Demonico.

*Christopher W. Driscoll* for the plaintiff.

DUFFLY, J. A family dispute over ownership of what had been the family home in Woburn prompted Frances M. Sparrow[2] to file a complaint in the Superior Court against her sister, Susan

---

[1]Susan A. Demonico.

[2]The plaintiff, Frances M. Sparrow, appears to have changed her name to Frances Elwell during the pendency of this case. We refer to her as Sparrow for consistency with the prior proceedings.

A. Demonico, and Susan's husband, David D. Demonico.[3] Prior to trial, the parties resolved their differences by a settlement agreement reached during voluntary mediation. When Sparrow sought an order enforcing the agreement, a Superior Court judge denied her motion, concluding in essence that, due to mental impairment, Susan lacked the capacity to contract at the time of agreement. Sparrow appealed and, after initially vacating the order denying enforcement and remanding the case for findings of fact, *Sparrow* v. *Demonico*, 73 Mass. App. Ct. 1121 (2009), the Appeals Court reversed the judge's order and remanded the case for entry of an order enforcing the settlement agreement. *Sparrow* v. *Demonico*, 77 Mass. App. Ct. 1120 (2010).

We granted further appellate review to consider whether a party can establish that she lacked the capacity to contract, thus making the contract voidable by her, in the absence of evidence that she suffered from a medically diagnosed, long-standing mental illness or defect. We conclude that our evolving standard of contractual incapacity does not in all cases require proof that a party's claimed mental illness or defect was of some significant duration or that it is permanent, progressive, or degenerative; but, without medical evidence or expert testimony that the mental condition interfered with the party's understanding of the transaction, or her ability to act reasonably in relation to it, the evidence will not be sufficient to support a conclusion of incapacity. Because the evidence was insufficient to support a determination of incapacity in this case, we vacate the motion judge's order and remand for entry of an order enforcing the settlement agreement.

*Background.* Sparrow's complaint, filed initially in July, 2003, and later amended, alleged that Sparrow was entitled to a one-half interest in the Woburn property, consistent with the wishes of her (and Susan's) now-deceased mother, under theories of constructive and resulting trusts. Susan, who resided in the Woburn property at the time of the mediation, and David, who had been separated from Susan for several years and was no longer residing with her, asserted that they were the sole owners of the property, as reflected in a deed, and denied that Sparrow

---

[3]Because the defendants share a last name, we refer to them individually by their first names.

had any interest in it.[4] Shortly before what was scheduled to be a final pretrial conference, the parties sought to achieve a settlement through voluntary mediation and the matter was removed from the trial list.

The parties and the attorneys who were representing them in the Superior Court proceeding participated in mediation on October 19, 2006. Sparrow contends that the case was settled during this mediation by an agreement that the Demonicos would sell the property and pay Sparrow $100,000 from the sale proceeds. When Sparrow sought an order enforcing the agreement, alleging that the Demonicos "reneged on their obligations under it," the Demonicos claimed that the agreement was unenforceable because Susan had, in their view, experienced a mental breakdown during the mediation and thus lacked the capacity to authorize settlement. At an evidentiary hearing on the motion, David and Susan were the only witnesses and no exhibits were admitted, although they were marked for identification.[5] The motion judge denied Sparrow's motion on the basis that "the purported agreement may have been the product of an emotionally overwrought state of mind on the part of Susan Demonico."[6] The case proceeded to trial by jury before a different judge, who, at the close of evidence, allowed the Demonicos' motion for a directed verdict on all counts. Sparrow appealed from the judgment and the denial of her motion to enforce the mediated settlement agreement.

---

[4]The record submitted by Sparrow did not include a copy of her verified amended complaint or the defendants' answer. See Mass. R. A. P. 18 (a), as amended, 425 Mass. 1602 (1997). We have nevertheless reviewed those pleadings.

[5]During direct examination of David, his attorney elicited testimony regarding how the property came to be acquired from Gloria Guertin, the mother of Susan and Sparrow. David's counsel sought to admit in evidence a copy of the deed reflecting the transfer, but the judge excluded it because, in the judge's view, "[David's] testimony regarding the ownership will suffice." Significantly, no evidence was introduced regarding the current value of the property or the outstanding debt on any mortgage or the amount of any other encumbrances.

[6]No party has raised any question as to the effect of the order on David. David has made no claim that he suffered from any incapacity or that the terms of the agreement are unreasonable. It is not at all clear from the evidence that an agreement void as to Susan because of her incapacity would also be void as to David. The practical consequences of such an order might depend on the nature of the title in which the property is held or whether Susan and David obtain a judgment of divorce. Deciding as we do, these questions need not detain us.

The Appeals Court concluded, in an unpublished memorandum and order issued pursuant to its rule 1:28, that the motion judge's determination that Susan may have been emotionally overwrought was not grounds to avoid the contract, vacated the order denying the motion to enforce it, and remanded for "express findings of fact on the extent of Susan's impairment at the time that she authorized the settlement agreement." *Sparrow* v. *Demonico*, 73 Mass. App. Ct. 1121 (2009). On remand, the motion judge issued written findings and an order denying Sparrow's motion to enforce the settlement agreement based on his determination that Susan "was mentally incapacitated on the day of the mediation," and thus that "she was not able to understand in a reasonable manner the nature and consequences of what was happening and did not have an ability to comprehend the transaction or its significance and consequences."

Sparrow again appealed and a different panel of the Appeals Court, in another unpublished memorandum and order, reversed, concluding that although "the evidence supported a finding that Susan was extremely upset and mentally distressed during — and by — the mediation, . . . it does not support a finding that she was mentally incapacitated to the extent required by our cases." The court noted that decisions that have concluded contracts were void due to incapacity have done so only where medical evidence demonstrated a permanent, progressive, degenerative or long-term illness "that has been diagnosed by a mental health professional." *Sparrow* v. *Demonico*, 77 Mass. App. Ct. 1120 (2010).

*Findings of fact.* We summarize the motion judge's subsidiary findings of fact, which we accept as not clearly erroneous, see *Kendall* v. *Selvaggio*, 413 Mass. 619, 620 (1992) and Mass. R. Civ. P. 52 (a), as amended, 423 Mass. 1402 (1996), and include additional details from evidence that the judge implicitly credited. See *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007), and cases cited. "[T]o ensure that the ultimate findings and conclusions are consistent with the law, we scrutinize without deference the legal standard which the judge applied to the facts." *Kendall* v. *Selvaggio, supra* at 621.

On the date of the scheduled mediation, Susan drove from her home to David's residence. From there, David drove them

to the location of the mediation session because, in David's view, Susan was not capable of driving to the mediation. The mediation began at approximately 9 A.M. and ended at 3 P.M. The judge, crediting David's testimony, found:

> "Susan was having a breakdown that day, according to David, and was slurring her words, although she had not had any alcoholic beverages on that day. She became less coherent throughout the day, was crying and out of control. . . . They left the mediation before it was over as Susan could not handle it."

The judge noted Susan's testimony that she had been taking a medication, Zoloft, prior to the mediation, but that she had stopped taking the medication at some point before the mediation, and that she cried much of the day; he specifically credited Susan's testimony that she "was out of control emotionally during the mediation" and found also that "she was not thinking rationally" on that day.[7]

As noted, both sides were represented by counsel throughout the mediation. At some point before they departed from the mediation session, the Demonicos authorized their attorney to execute a settlement agreement on their behalf.[8] According to

---

[7]The Appeals Court's unpublished memorandum and order sets forth succinctly what was not included in the evidence:

> "There was no evidence — nor were there any findings — that Susan was suffering from a diagnosed mental illness, either on the day of the mediation or at any other time. Although she had taken a medication, Zoloft, at some time in the past, there was no evidence that she was taking any medication on the day of the mediation or that she should have been taking medication. Nor was there any evidence as to the effects (if any) of taking or not taking Zoloft. There was no medical testimony, nor was there any other expert testimony as to Susan's mental condition. There was no evidence that Susan's mental agitation was of any significant duration, let alone that it was permanent, progressive, or degenerative. Equally important, there was no evidence that Susan suffered any mental incapacity outside of the very limited context of the mediation. There was no evidence to suggest that she had a mental incapacity that affected any other aspect of her life, her daily living, or her decision-making."

*Sparrow* v. *Demonico*, 77 Mass. App. Ct. 1120 (2010).

[8]We note that the record evidence is ambiguous regarding the precise timing or nature of the authorization. Sparrow's motion to enforce a mediated

the terms of a written agreement titled, "Memorandum of Settlement," which was signed by Sparrow, her attorney, and the Demonicos's attorney, and witnessed by the mediator, the Demonicos agreed to pay Sparrow "the settlement amount of $100,000" from the proceeds of the sale of the property, which would occur "as soon as practicable," and in any event within a specified timeframe. The agreement also set forth other affirmative requirements regarding the marketing and sale of the property.

*Discussion.* A settlement agreement is a contract and its enforceability is determined by applying general contract law. *Warner Ins. Co.* v. *Commissioner of Ins.*, 406 Mass. 354, 360 n.7 (1990). It has been long established that a contract is voidable by a person who, due to mental illness or defect, lacked the capacity to contract at the time of entering into the agreement.[9] See, e.g., *Bucklin* v. *National Shawmut Bank*, 355 Mass. 338, 341 (1969); *Gibson* v. *Soper*, 6 Gray 279 (1856). The burden is on the party seeking to void the contract to establish that the person was incapacitated at the time of the transaction. *Meserve* v. *Jordan Marsh Co.*, 340 Mass. 660, 662 (1960). See *Wright* v. *Wright*, 139 Mass. 177, 182 (1885).

a. *Standard for determining contractual incapacity.* As Justice

settlement agreement asserts that "Defense Counsel represented he was authorized to execute a settlement, communicated with [the Demonicos] by telephone, and he signed the attached agreement."

The Demonicos have at no time raised any defenses regarding their attorney's authorization to sign the mediated settlement agreement on their behalf. See *Colley* v. *Benson, Young & Downs Ins. Agency, Inc.*, 42 Mass. App. Ct. 527, 534-535 (1997) (describing affirmative burden to demonstrate that counsel not authorized to act on party's behalf). See also *Carey* v. *New England Organ Bank*, 446 Mass. 270, 285 (2006) (alternate defenses not raised before trial judge are waived).

[9]The capacity to contract is distinct from testamentary capacity, in which different considerations control the analysis. See *Krasner* v. *Berk*, 366 Mass. 464, 468 (1974) (upholding finding of incapacity to contract, while noting that evidence would support finding of testamentary capacity); *Maimonides Sch.* v. *Coles*, 71 Mass. App. Ct. 240, 251 (2008), quoting *Palmer* v. *Palmer*, 23 Mass. App. Ct. 245, 250 (1986) (in contrast to more demanding test for contractual capacity, standard for testamentary capacity requires ability at time of execution of alleged will to comprehend nature of act of making will); *Farnum* v. *Silvano*, 27 Mass. App. Ct. 536, 538 (1989) (acting during lucid interval can be basis for executing will but "competence to enter into a contract presupposes something more than a transient surge of lucidity").

Holmes observed, it is a question of fact whether a person was competent to enter into a transaction — that is, whether the person suffered from "insanity" or "was of unsound mind, and incapable of understanding and deciding upon the terms of the contract." *Id.* at 182-183. In *Reed* v. *Mattapan Deposit & Trust Co.*, 198 Mass. 306, 314 (1908), we described this inquiry as the "true test" of mental incapacity:

> "But while great mental weakness of the individual may exist without being accompanied by an entire loss of reason, and mental incapacity in one case is not necessarily so in another, in such an inquiry the true test is, was the party whose contract it is sought to avoid in such a state of insanity at the time as to render him incapable of transacting the business. When this fact is established the contract is voidable by the lunatic or his representatives, and it is no defense under our decisions that the other party acted fairly and without knowledge of his unsoundness or of any circumstances which ought to have put him upon inquiry."

We applied this test, also known as the "cognitive test," see *Ortelere* v. *Teachers' Retirement Bd. of the City of N.Y.*, 25 N.Y.2d 196, 202 (1969) (*Ortelere*), without significant modification for fifty years thereafter. See *Meserve* v. *Jordan Marsh Co.*, *supra* (to avoid contract based on mental incapacity requires showing that person was "in such a state of insanity" at time of contracting as to render person "incapable of transacting the business"); *Adams* v. *Whitmore*, 245 Mass. 65, 68 (1923) (incapacity requires proof that person "was too weak in mind to execute the deed with understanding of its meaning, effect and consequences"); *Sutcliffe* v. *Heatley*, 232 Mass. 231, 232 (1919) (test is whether person "could not understand the nature and quality of the transaction or grasp its significance").

Over time, however, the traditional test for contractual incapacity, both in Massachusetts, see *Krasner* v. *Berk*, 366 Mass. 464, 467-468 (1974), and in other jurisdictions, see, e.g., *Ortelere*, *supra*, evolved to incorporate an increased understanding of the nature of mental illness in its various forms. See *Matter of the Marriage of Davis*, 193 Or. App. 279, 285-287 (2004) (Deits,

C.J., concurring) (discussing evolution of incapacity standards); 5 R.A. Lord, Williston on Contracts § 10:8 at 341-343 (4th ed. 2009) (historically, little distinction made between different kinds of mental incompetency or illness; "[t]he law now recognizes a wide variety of types and degrees of mental incompetency and distinctions among the various types of mental illness"). Based on this understanding, we adopted a second, alternative test for incapacity.

In *Krasner* v. *Berk, supra,* we recognized that there may be circumstances when, although a party claiming incapacity has some, or sufficient, understanding of the nature and consequences of the transaction, the contract would still be voidable where, "by reason of mental illness or defect, [the person] is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition."[10] *Id.* at 468, citing *Ortelere, supra* at 204-205.[11] This modern test — also described as an "affective" or "volitional" test — recognizes that competence can be lost, not only through cognitive disorders, but through affective disorders that encompass motivation or exercise of will. See *Ortelere, supra* at 204-205, quoting Note, Mental Illness and the Law of Contracts, 57 Mich. L.R. 1020, 1036 (1959) (recommending "that a complete test for contractual incapacity should provide protection to those persons whose contracts are merely uncontrolled reactions to their mental illness" as well to those who could not understand nature and consequences of their actions). See also *Gore* v. *Gadd,* 268 Or.

---

[10]That a party may appear to be acting in a reasonable manner in relation to the transaction and the other party is thus unaware of any mental illness or defect does not preclude, where it is supported by the evidence, a finding of incapacity under our traditional test. "[I]f the evidence of mental incompetency is overwhelming, the orthodox test will serve to invalidate the transaction." Green, Proof of Mental Incompetency and the Unexpressed Major Premise, 53 Yale L.J. 271, 310 (1944) (Green). See *Farnum* v. *Silvano, supra* at 539-540.

[11]In *Ortelere* v. *Teachers' Retirement Bd. of the City of N.Y.,* 25 N.Y.2d 196, 199 (1969) (*Ortelere*), although the decedent's psychosis was undisputed, it was not seriously disputed that "she had complete cognitive judgment or awareness when" she entered into the transaction. The court held that the contract was nonetheless voidable because "[a] modern understanding of mental illness . . . suggests that incapacity to contract or exercise contractual rights may exist, because of volitional and affective impediments or disruptions in the personality, despite the intellectual or cognitive ability to understand."

527, 528-529 (1974) (under affective test, person such as one who is manic-depressive psychotic, although aware of nature and consequences of conduct, may still be considered incompetent because mental illness "impel[s person] to act irrationally" and such person is "incapable of making a rational judgment in the execution of the transaction").

Under this modern, affective test, "[w]here a person has some understanding of a particular transaction which is affected by mental illness or defect, the controlling consideration is whether the transaction in its result is one which a reasonably competent person might have made." *Krasner* v. *Berk, supra* at 469, quoting Restatement (Second) of Contracts § 18C comment b (Tent. Drafts Nos. 1-7, 1973). See Green, Proof of Mental Incompetency and the Unexpressed Major Premise, 53 Yale L.J. 271, 307 (1944). Also relevant to the inquiry in these circumstances is whether the party claiming mental incapacity was represented by independent, competent counsel. See *Willett* v. *Webster*, 337 Mass. 98, 103 (1958). Contrast *Farnum* v. *Silvano*, 27 Mass. App. Ct. 536, 537, 540 (1989) (plaintiff's mental competence had begun to fail several years before she delivered deed to defendant; she was represented in transfer of real estate by lawyer selected and paid for by defendant, whose mission "was to effect the transaction," rather than to protect plaintiff's interests).[12]

b. *Evidence of contractual incapacity.* We begin by observing that the evidence required to support a finding of incapacity to contract, whether considered under the traditional or modern standard, need not in all cases demonstrate that a party suffers

---

[12]Additionally, we note that even where evidence of a weakened mental condition is not enough to support a conclusion that the party was "too weak in mind to execute the deed with understanding of its meaning, effect and consequences," this weakened mental condition has nevertheless been a factor "in determining whether advantage was taken of [the party] by misrepresentation, imposition or undue influence." *Adams* v. *Whitmore*, 245 Mass. 65, 68 (1923). Cf. *Meserve* v. *Jordan Marsh Co.*, 340 Mass. 660, 668 (1960) (noting that judge justified in concluding that "there was no undue influence, imposition, or misrepresentation"); Green, *supra* at 307 (noting "extremely intimate relationship between the concepts of fraud, undue influence, and mental incompetency. They are in a sense complementary and aid each other . . ."). No claim of undue influence, imposition, or misrepresentation has been made in this case, nor would such a claim have been supported by the evidence.

from a mental illness or defect that is permanent, degenerative, progressive, or of significant duration. Although such incapacity has historically been established by evidence of a long-standing mental illness, nothing in our jurisprudence requires such evidence. The inquiry as to the capacity to contract focuses on a party's understanding or conduct only at the time of the disputed transaction. See *Krasner* v. *Berk, supra* at 468; *Meserve* v. *Jordan Marsh Co.*, 340 Mass. 660, 662 (1960). Based on the evolving understanding of mental illness, we do not preclude the possibility that a party could establish an incapacity to contract without proof of a mental condition that is permanent, degenerative, progressive, or long standing.

The Demonicos contend that this is such a case; that the evidence established Susan's incapacity without showing a permanent, degenerative, progressive, or long-standing mental illness. They point to evidence that Susan's asserted mental impairment arose and was limited to the period of the mediation session, and argue that this evidence was sufficient to support a conclusion of incapacity, despite the lack of medical evidence or expert testimony as to the nature of Susan's mental impairment and its effect on her decision-making ability.

We have not previously addressed whether medical evidence is required to establish an incapacity to contract, and the Demonicos have not directed our attention to case law in other jurisdictions that would support their contention. In our prior decisions concerning the issue of incapacity to contract, however, evidence of mental illness or defect has been presented consistently through medical evidence, including the testimony of physicians and mental health providers or experts, in addition to lay testimony.[13] Moreover, in other contexts, we have held that a lay witness is not competent to give an opinion as to mental condition. See *Commonwealth* v. *McDermott*, 393 Mass. 451, 454 (1984). Cf. *Commonwealth* v. *Schulze*, 389 Mass. 735, 738-740 (1983). Expanding on this analysis, we conclude that

---

[13]See, e.g., *Krasner* v. *Berk*, 366 Mass. 464, 466 (1974); *M. DeMatteo Constr. Co.* v. *Daggett*, 341 Mass. 252, 255 (1960); *Meserve* v. *Jordan Marsh Co., supra* at 663-664; *Costello* v. *Hayes*, 249 Mass. 349, 352 (1924); *Farnum* v. *Silvano, supra* at 537. See also *Ortelere, supra* at 201-202; *Matter of the Marriage of Davis*, 193 Or. App. 279, 281, 283 (2004) (Deits, C.J., concurring).

medical evidence is necessary to establish that a person lacked the capacity to contract due to the existence of a mental condition.

In other contexts, the reliance on medical and expert evidence is routine when addressing issues of mental illness, capacity, and competence. See, e.g., *Commonwealth* v. *DiPadova*, 460 Mass. 424, 426-428 (2011) (criminal responsibility); *O'Rourke* v. *Hunter*, 446 Mass. 814, 822 (2006) (testamentary capacity). See also *Vitek* v. *Jones*, 445 U.S. 480, 495 (1980), quoting *Addington* v. *Texas*, 441 U.S. 418, 429 (1979) (question of mental illness in civil commitment context is "essentially medical," which "turns on the meaning of facts which must be interpreted by expert psychiatrists and psychologists").

Where the issue is the capacity to contract, we have looked to medical providers or experts to explain whether, and to what extent, a person's mental condition has affected the ability to understand the nature of the transaction and its consequences, or to explain why, despite the intellectual and cognitive ability to understand, the person is unable to act reasonably in making the decision. See, e.g., *Krasner* v. *Berk*, *supra* at 466; *Meserve* v. *Jordan Marsh Co.*, *supra* at 663-664. See also T. Grisso & P.S. Appelbaum, Assessing Competence to Consent to Treatment 10, 20-23 (1998) (legal standards for competence, including competence to contract, "focus on certain functional abilities on which the law relies to structure its thinking about competence, based on information that clinicians and others can provide about patients' functional deficits or strengths in decision making").

The inquiry in this area is in contrast to other areas of the law, such as tort claims of emotional distress or mental anguish, where the inquiry is whether the evidence supports a plaintiff's claim to have experienced emotional distress or mental anguish, rather than on the impact of that state on the ability to comprehend. See *Sullivan* v. *Boston Gas Co.*, 414 Mass. 129, 138 (1993). Yet even in the context of an action sounding in tort, we have often considered medical corroboration to be a highly probative, if not essential, component of a plaintiff's case. See *id.* at 137-138; *Payton* v. *Abbott Labs*, 386 Mass. 540, 556 (1982). See also *Bresnahan* v. *McAuliffe*, 47 Mass. App. Ct. 278, 285 (1999) (more difficult, but not impossible, for plaintiff

to meet burden in absence of medical evidence). Such corroboration not only guards against feigned or fraudulent claims of mental distress, but also alleviates the concern "that even honest plaintiffs erroneously might convince themselves that they suffer from emotional distress . . . thereby compounding the problem of fraudulent lawsuits." *Sullivan* v. *Boston Gas Co.*, *supra* at 133, citing *Payton* v. *Abbott Labs*, *supra* at 547. These concerns apply with at least equal force where the question is the capacity to contract due to mental impairment. See *Ortelere*, *supra* at 206 ("nothing less serious than medically classified psychosis should suffice or else few contracts would be invulnerable to some kind of psychological attack").

Here, there was lay evidence, credited by the judge, that Susan's speech was "slurr[ed]," that she was in a state of uncontrollable crying, and that she had experienced an inability to focus or "think rationally" throughout the day of the mediation. Susan testified also that she had recently discontinued taking the prescribed medication Zoloft. However, she presented no medical evidence regarding a diagnosis that would have required her to take the medication, or the effect, if any, that ceasing to take the medication would have had on her medical or mental condition. There was also no evidence that Susan's condition at the mediation was related to or caused by her discontinuing the medication.[14]

"A non-expert is competent to testify to the physical appearance and condition and acts of a person both for their probative value for the jury and for the purpose of furnishing facts as the basis of hypothetical questions for experts." *Cox* v. *United States*, 103 F.2d 133, 135 (7th Cir. 1939). See *Brown* v. *United States Fid. & Guar. Co.*, 336 Mass. 609, 614 (1958) (wife's testimony about nervous condition of husband prior to his death, although admissible as matter of common observation by lay

---

[14]At the evidentiary hearing, defense counsel argued that Susan "testified to all of the classic symptoms" of discontinuing Zoloft: "anxiety, confusion, the inability to focus, crying, and loss of memory." Not only was there no evidence presented to support the proposition that these are indeed "classic symptoms" associated with the cessation of Zoloft, but the Demonicos also failed to present any evidence linking such generalities to Susan's mental capacity. Contrary to the Demonicos's argument, it would not have been reasonable for the judge to infer that Susan was experiencing "possible withdrawal effects" based on the evidence presented.

person, not sufficient to prove whether disease was proximate or contributing cause of death). However, there was no expert or medical testimony to explain the effect of Susan's experiences or behavior on her ability to understand the agreement, to appreciate what was happening, or to comprehend the reasonableness of the settlement terms or the consequences to her of authorizing the settlement. Without such medical evidence, there was no basis to conclude that Susan lacked the capacity to contract. See *Farnum* v. *Silvano, supra* at 539-540 (plaintiff, who "suffered mental disease which had manifested itself in erratic and irrational conduct and was confirmed by diagnostic test," did not possess "requisite contextual understanding" of transaction). Contrast *Grindlinger* v. *Grindlinger*, 10 Mass. App. Ct. 823, 823 (1980) ("fatigue and anxiety" not sufficient to invalidate separation agreement).

The evidence did not support a conclusion that, under the traditional test for incapacity, Susan was incapable of understanding the nature and quality of the transaction, or of grasping its significance. Indeed, based on Susan's testimony, she understood at the time that she was participating in a mediation to discuss settlement of the lawsuit; she was aware that the subject of the mediation was to resolve the dispute regarding the family home in Woburn; she participated in the mediation and listened to the arguments of counsel; and she "couldn't believe how things [were] turning out."

It is apparent from Susan's testimony that, even if she suffered from a transient mental defect, or "breakdown" as the judge concluded, she had at least some understanding of the nature of the transaction and was aware of its consequences. Under the modern test to establish Susan's incapacity, the evidence was similarly insufficient. There was no evidence that the settlement agreement was unreasonable, or that a reasonably competent person would not have entered into it.[15]

*Conclusion.* Because the evidence does not support a conclu-

---

[15]As stated, there was no evidence as to the current market value of the property or whether any mortgages or other encumbrances would affect the reasonableness of the $100,000 settlement amount, see note 5, *supra*; nor was there evidence that otherwise reasonable settlement terms were unreasonable in light of Susan's particular circumstances. Contrast *Farnum* v. *Silvano*, 27 Mass. App. Ct. 536, 540 (1989). There was also no evidence that Sparrow

sion that Susan lacked the mental capacity to authorize settlement on the day of the mediation, it was error to deny Sparrow's motion to enforce the agreement. The order denying the motion to enforce the mediated settlement agreement is vacated. The case is remanded to the Superior Court for entry of an order that the settlement agreement be enforced.

*So ordered.*

---

was, or should have been, aware of Susan's condition. Finally, there is no indication that Susan was not represented by independent, competent counsel in connection with the settlement agreement. Compare *M. DeMatteo Constr. Co.* v. *Daggett*, 341 Mass. 252, 260-261 (1960), with *Farnum* v. *Silvano*, *supra*.