CAVE vs. CAVE, MISC 19-000412

































 
 ARNOLD CAVE and LAURIE HILLSON, as personal representatives of the Estate of Cheryl Ann Ingersoll, [Note 1] Plaintiffs, v. JOHN CAVE, individually and as executor of the Estate of Ann M. Krochmal, Defendant
 MISC 19-000412 
 SEPTEMBER 29, 2021
MIDDLESEX, ss.
VHAY, J.
DECISION














 In 2002, John Cave, Arnold Cave, and Cheryl Ingersoll, née Cave (together, the "Cave Siblings"), signed an agreement for compromise of will, which they submitted to the Middlesex Probate and Family Court (the "Probate Settlement"). The Probate Settlement places conditions on a 79-acre parcel in Wilmington, Massachusetts (the "Wilmington Land") and three additional parcels in Tewksbury, Massachusetts (the "Tewksbury Land"; together with the Wilmington Land, the "Restricted Parcels"), all owned now by defendant John Cave. 





 This case centers on one such condition, found in paragraph 3 of the Probate Settlement (what this decision calls the "Sale Provision"). It states in part that "[i]f any portion of [the Restricted Parcels] should be sold or cease to be operated as a farm [before July 18, 2023], then the [Wilmington Land] shall be sold for its then fair market value and the proceeds therefrom shall be divided equally by and among" the Cave Siblings. 





 Plaintiffs Arnold Cave and Laurie Hillson, the latter being the daughter of the now deceased Cheryl Ann Ingersoll and a personal representative of her Estate, argue that they are entitled under the Sale Provision to an order of specific performance, one directing John Cave (both individually and in his capacity as executor of the Estate of Ann M. Krochmal) to sell the Wilmington Land and divide its proceeds. [Note 2] Arnold and Laurie's complaint in this Court originally alleged that three things had triggered the Provision: (1) a part of the Wilmington Land allegedly had been leased for a cell tower, (2) John was raising hogs on another part of the Wilmington Land; and (3) Bacher Maintenance Corp ("BMC") had leased yet another part of the land for a composting business. 





 The Court resolved issues (1) and (2) on summary judgment in 2020, in John's favor. John also had moved at that time for summary judgment on issue (3), but the Court allowed Arnold and Laurie's request to postpone deciding that issue until the end of discovery. The Court identified two principal disputes pertaining to issue (3): the meaning of the Probate Settlement's term "operated as a farm," and whether BMC's operations in July 2002, or since, have caused farm operations to "cease" within any portion of the Restricted Parcels. 





 Discovery has ended, and the parties have reappeared for argument on issue (3). After reviewing the summary-judgment record and having heard the arguments of counsel, the Court HOLDS that BMC's composting operations on the Restricted Parcels since 2002 (the date of the Probate Settlement) are within the Sale Provision's term "operat[ions of] a farm," and have not caused farm operations to "cease" within any portion of the Restricted Parcels. The Court thus GRANTS John summary judgment on issue (3), and will dismiss Arnold and Laurie's complaint. [Note 3] 





 Here are the undisputed facts that pertain to issue (3). The Cave Siblings are the children of Ann Krochmal, and are the stepchildren of her husband John Krochmal. Over the years, John and Ann Krochmal owned numerous parcels in Wilmington and Tewksbury. Two of their Wilmington parcels and three of their Tewksbury parcels comprise what are now the Restricted Parcels. The Krochmals also operated Krochmal Farm, and on part of that farm they raised some pigs. [Note 4] To help feed those pigs, the Krochmals collected garbage and swill from neighboring towns. 





 For years John Cave assisted the Krochmals' garbage-collection efforts. For a time, his brother Arnold helped: between 1968 and late 1971 or early 1972, John and Arnold were partners in Cave Brothers Livestock. The partnership focused primarily on pig farming on the Restricted Parcels. The partnership's activities included the collection of swill and garbage from municipalities for transport to the Restricted Parcels to feed the partnership's hogs. 





 Cave Brothers Livestock ended around 1972. In 1978, John Cave began a second partnership, this one with Mr. Krochmal. This decision calls that partnership "Krochmal Cave." Like Cave Brothers Livestock, Krochmal Cave raised pigs. Krochmal Cave also collected offsite garbage and swill for transport to Krochmal Farm, to feed hogs. 





 Krochmal Cave operated until 1981. In connection with winding up its business, John Cave conveyed to the Krochmals land that John owned in Lunenburg, Massachusetts. In exchange, the Krochmals transferred to John and his wife Jan the Tewksbury Land. Thereafter, John took on a significant role in managing Krochmal Farm. He worked with Mr. Krochmal for six years, until the latter's death in 1987. At that point, Krochmal's widow, Ann, became the sole owner of the Wilmington Land. With John's help, she continued to operate Krochmal Farm, raising pigs and other animals. In 1988, the Tewksbury Board of Health granted the Farm a permit to transport garbage, offal, and other offensive substances in Tewksbury. The Board has renewed that permit annually. In 1995, the Commonwealth's Department of Food and Agriculture (now the Massachusetts Department of Agricultural Resources ("MDAR")) granted the Farm a permit to feed garbage to swine. That permit too has been renewed annually. 





 In February 1995, John Cave signed on behalf of Krochmal Farm a three-year commercial lease with BMC. Under the lease, BMC agreed to pay Krochmal Farm $1,500 monthly for a five-acre plot, within the Restricted Parcels, for a facility "to receive clean non polluted wood related products such as brush, stumps, leaves, etc. and process same into a mulch for wholesale." BMC also received approval for its facility from the Wilmington Board of Health. In April 1995, BMC applied for and received from the Massachusetts Department of Environmental Protection ("MDEP") permission pursuant to 310 CMR 16.05 to operate on its leasehold a wood-waste recycling yard. In 1996, BMC received from MDAR certification as an agricultural composter pursuant to 330 CMR 25.00. (Arnold and Laurie agree that BMC and John renewed these permits and certifications through at least 2007.) After the initial term of their lease ended in 1998, BMC and the Farm orally agreed (and they continue to agree) to allow BMC to maintain a composting operation at the Farm, albeit under new terms. [Note 5] 





 Ann Krochmal died on January 2, 2001. On January 17, 2001, John Cave filed a petition for probate and allowance of her will. Arnold and Cheryl objected, and litigation ensued until June 28, 2002. On that date, John, Arnold, and Cheryl signed a handwritten memorandum of understanding and agreement of compromise. The memorandum included an exhibit, reproduced from the Town of Tewksbury Assessors Maps, with handwritten notes identifying the Restricted Parcels and the location of a "mulch field." The parties thereafter signed the Probate Settlement. Under the Settlement, John received the Wilmington Land in fee simple, subject to the Sale Provision. (John already owned the Tewksbury Land.) The Sale Provision requires John to operate and use the Restricted Parcels as a farm for 21 years from the effective date of the Probate Settlement: "If any portion of either the [Wilmington Land] or the [Tewksbury Land] should be sold or cease to be operated as a farm within the aforementioned twenty-one . . . year period, then the [Wilmington Land] shall be sold for its then fair market value and the proceeds therefrom shall be divided equally by and among" John, Arnold, and Cheryl. 





 Since 1995, BMC has accepted farm waste from Krochmal Farm and incorporated that waste into BMC's composting operations. The resulting compost is either used at Krochmal Farm or sold to other customers. In a 2011 application to MDAR for renewal of BMC's agricultural composting certificate, BMC certified that the Farm used 69% of the compost BMC processed at the Farm. For a 2020 renewal, John certified that 5,000 cubic yards of the total 9,500 cubic yards (or 53%) of the compost BMC generated was applied at the Farm. While Arnold and Laurie have provided evidence that, in some years, BMC sold to the public all compost it generated at the Farm, they offered no evidence that during those same years, the Farm stopped providing waste to BMC. 





 With these facts in mind, the Court returns to the Sale Provision. The Probate Settlement is a contract subject to the usual rules of contract interpretation. See Sparrow v. Demonico, 461 Mass. 322 , 327 (2012) (settlement agreement between sisters is a contract; its enforceability is subject to the general rules of contract law); Am. Venture 594 Corp. v. A. Russo & Sons, Inc., 79 Mass. App. Ct. 770 , 774 (2011) (same). "Justice, common sense and the probable intention of the parties are guides to construction of a written instrument." Stop & Shop, Inc. v. Ganem, 347 Mass. 697 , 701 (1964). 





 If a term within a contract is "plain and free from ambiguity," the court must construe it in its "usual and ordinary sense." Larabee v. Potvin Lumber Co., 390 Mass. 636 , 641 (1983). Whether a term is ambiguous is a question of law. See Eigerman v. Putnam Invs., Inc., 450 Mass. 281 , 287 (2007). That the parties offer competing interpretations of a term does not mean, by itself, that the term is ambiguous, and neither does the existence of multiple dictionary definitions for a term. See Citation Ins. Co. v. Gomez, 426 Mass. 379 , 381 (1998). A term is ambiguous only if, in the context of the document, see Save-Mor Supermarkets, Inc. v. Skelly Detective Service, Inc., 359 Mass. 221 , 226 (1971), the term has multiple connotations over which "reasonably intelligent persons would differ as to which meaning is the proper one." Citation Ins., 426 Mass. at 381. If a contractual term is not ambiguous, its interpretation remains a question of law, one that a court may decide on summary judgment. See Seaco Ins. v. Barbosa, 435 Mass. 772 , 779 (2002). 





 In their complaint, Arnold and Laurie assert that any composting occurring on the Restricted Parcels that involves "material not produced on site" falls outside the Sale Provision's definition of the "operat[ion of] a farm." Having completed discovery, Arnold and Laurie have presented no facts that show that the parties to the Probate Settlement intended to prohibit composting generally, or composting that includes material generated outside of the Restricted Parcels. To the contrary: Arnold and Laurie concede that before 2002, (a) Krochmal Farm was engaged in composting; (b) it was accepting materials not produced on site, (c) Arnold personally was involved in such activities back in the 1970s, and (d) the plan attached to the parties' 2002 memorandum of understanding shows that a "mulch" area existed at the time of the Probate Settlement. They further concede at page 5 of their second opposition to John's motion for summary judgment that certified "agricultural composting operations" ("ACOs") lawfully may receive materials generated offsite. See also 330 CMR. 25.03(9) (requiring ACOs to derive "at least 25%" of the compostable materials they generate from agricultural material "produced by the owner or lessee of the land where the [operations are] located"). The Court thus rejects Arnold and Laurie's claim that, merely by accepting offsite materials, John ceased "operat[ing] as a farm" on the Restricted Parcels. 





 Having lost their "no-offsite-materials" argument, Arnold and Laurie contend instead that, under two different regulations, BMC's particular composting operation is not farming. Those regulations are 310 CMR 16.05, an MDEP regulation pertaining to permits for "Recycling, Composting and Conversion Operations," and 330 CMR 25.03, MDAR's regulation pertaining to the registration of ACOs. The flaw in Arnold and Laurie's argument is like that with their "no-offsite-materials" argument: they've offered no evidence that the parties to the Probate Settlement considered, or meant to incorporate into the Settlement, either regulation. Arnold and Laurie thus haven't persuaded the Court that "reasonably intelligent persons" would bypass a plain meaning or contextual interpretation of the Settlement's term "operat[ions of] a farm" in favor of how either 310 CMR 16.05 or 330 CMR 25.03 defines agricultural composting. 





 The Court thus returns to the text of the Sale Provision. The word "farm," standing alone, has multiple meanings: "1. a. A tract of land cultivated for the purpose of agricultural production. b. The fields, buildings, animals, and personnel appurtenant to a farm. 2. a. A tract of land devoted to the raising and breeding of domestic animals. . . ." The American Heritage Dictionary, 490 (2d C. Ed. 1982). The Court could accept, based on these definitions alone, one interpretation of "farm" that would include BMC's composting operation, and one that would not. But when taken in conjunction with the Provision's words "operated as," the conflict between the competing interpretations of "farm" lessens. To "operate" any concern, including a farm, is to "conduct the affairs of; manage." Id. at 871. The Court concludes from this combination of terms that the Sale Provision merely requires John to conduct the affairs of, or manage, the Restricted Parcels for the purpose of agricultural production. Thus, so long as BMC's composting operation is part of the management of the Parcels' agricultural output, BMC's operation is within the meaning of what the Probate Settlement calls the "operat[ions of] a farm." 





 To add additional context to "operat[ion of] a farm," the Sale Provision states more fully that "if any portion of the [Restricted Parcels] should . . . cease to be operated as a farm . . . ." (Emphasis added.) The word "cease" is not ambiguous. The American Heritage Dictionary defines "cease" as "To put an end to; discontinue. . . . To come to an end; stop." Id. at 250. The Sale Provision's use of the word "cease" suggests that, at the time the parties signed the Probate Settlement, the Restricted Parcels were being "operated as a farm." It's undisputed that by the time the parties signed the Settlement, BMC had been operating on the Restricted Parcels for seven years, accepting Krochmal Farm's wastes and generating usable agricultural compost. BMC's actual operations on the Farm in 2002 inform what John, Arnold, and Cheryl understood, or should have understood, the term "operat[ing] as a farm" to mean. 





 That the parties knew, or should have known, that "operat[ing] as a farm" included BMC's operations on the Restricted Parcels as of 2002 doesn't wholly resolve, however, issue (3). Arnold and Laurie have presented evidence that BMC has expanded its operations beyond the five acres it leased from Krochmal Farm in 1995. Arnold and Laurie contend that any land BMC has used beyond the original five acres (the "Extra Areas") has "cease[d] to be operated as farm." The Court isn't convinced. It's undisputed that, even in the Extra Areas, BMC is accepting from Krochmal Farm manure and other farm waste generated at the Farm. It's also undisputed that in many years, Krochmal Farm receives finished compost from BMC for use in the Farm's operations. Arnold and Laurie have presented no evidence that any part of BMC's operations is either isolated entirely from the Farm's organic "inputs" or generates materials that are never used at the Farm. Arnold and Laurie thus have failed to show, on summary judgment, that any part of the Restricted Parcels has "cease[d] to be operated as a farm." 





 For these reasons, the Court GRANTS John Cave's motion for summary judgment. Judgment to enter accordingly. 





FOOTNOTES
[Note 1] It's not clear from the record before this Court (including the pleadings) whether Arnold Cave and Laurie Hillson share the role of personal representative of the estate of Cheryl Ann Ingersoll. Regardless, this decision is binding on both Mr. Cave and Ms. Hillson, whatever their capacities. 

[Note 2] Since the parties are related, hereafter this Decision will refer to them hereafter by their first names. 

[Note 3] In light of this decision, the Court need not rule on John's motion to strike some of the evidence Arnold and Laurie offered in opposition to John's motion for summary judgment. 

[Note 4] The summary-judgment record doesn't show what lands comprised Krochmal Farm at its inception. Permits granted to Krochmal Farm also variously call it "Krochmal Farms." None of the parties has explained Krochmal Farm's legal status at the various times described in this decision. 

[Note 5] For example, BMC's principal, Richard Corsetti, testified at a deposition in February 2021 that BMC currently was paying John $6,000 per month. See Deposition of Richard Corsetti, 35 ("Corsetti Deposition," attached as Appendix 1 to Plaintiffs' Appendix to their Opposition to Defendant's Motion for Summary Judgment). In a 2020 affidavit, Corsetti stated that the monthly payment was rent under a still-effective lease of John's property. See Affidavit of Richard Corsetti, ¶¶ 6-8 (attached at Tab 20 to Appendix to Defendant's Motion for Summary Judgment). At his deposition, however, Corsetti said that BMC no longer had a lease on "the property," Corsetti Deposition at 16-17, and that the $6,000 monthly payment was merely for the purchase of John's "organics, the manure, we were paying him for it," id. at 35-36. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.