SUPERIOR COURT 
 
 RICHARD W. GANNETT V. RICHARD NEUMEIER, MORRISON MAHONEY LLP, MINNESOTA LAWYERS MUTUAL INSURANCE COMPANY, MOLLY EIDEN and MEL L. GREENBERG

 
 Docket:
 2184CV00789-C
 
 
 Dates:
 June 28, 2024
 
 
 Present:
 Robert B. Gordon
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' JOINT MOTION TO ENFORCE SETTLEMENT
 
 

             Plaintiff Richard W. Gannett ("Plaintiff' or "Gannett"), a disbarred attorney representing himself prose, brought this action against his professional liability insurer, Minnesota Lawyers Mutual Insurance Company ("MLM"); against MLM's employee, Molly Teigen ("Teigen");[1] and against his form er attorneys, Mel L. Greenberg (''Attorney Greenberg"), Richard Neumeier ("Attorney Neumeier"), and Morrison Mahoney LLP ("Morrison Mahoney''). During an in-
person hearing held on January 8, 2024, the parties reported a settlement agreement to the Court, resolving a portion of Plaintiffs claims. Now·before the Court is Defendants' Joint Motion to Enforce Settlement. For the reasons which follow, the Defendants' Motion shall be ALLOWED.
CLAIMS AND PROCEDURAL BACKGROUND
            Gannett was admitted to the Massachusetts bar in 1982, and practiced law for nearly 40 years before being disbarred on November 3, 2020. Beginning in or around 1990 and continuing until his disbarment, Gannett operated his own law practice in Massachusetts, representing
 
--------------------------------------------
 
[1] Nee Molly Eiden
 
                                                            -1-
 
clients in bankruptcy, fraudulent transfer, wrongful termination, and commercial litigation. Gannett describes himself as a lawyer of broad litigation experience, well versed in the practices and norms of courts in the Commonwealth.
A. Arbitration - North Beacon Matter
            Gannett represented North Beacon 155 Associates LLC ("North Beacon") in a civil action to recover unpaid rent from a commercial tenant. (See North Beacon 155 Assocs. LLC v. Spectrowax Corp., No. l 184CV02857.) On or about September 14, 2016, North Beacon terminated Gannett's attorney engagement for failing to effectuate an agreed-upon settlement with the tenant. Thereafter, North Beacon's new counsel, Pasternak, Blankstein & Lund LLP ("PB&L"), completed the settlement. Gannett thereupon filed an attorney's lien on the settlement amount ($208,000), seeking to recover his fees and costs. North Beacon moved the Court for an order determining the amount of Gannett's lien, and for an award of the fees and costs North Beacon had incurred to complete the settlement and obtain its client file from Gannett. The Court ordered Gannett and North Beacon to arbitration pursuant to a clause in their fee agreement, and directed that the settlement amount be placed in escrow in PB&L's IOLTA account pending resolution of the claims. (Id. Dkt. Nos. 223 (Jan. 6, 2017) (Fahey, J.) and 229 (June 23, 2017) (Campo, J.).)
            Gannett represented himself at the ensuing arbitration as to the attorney lien. MLM' retained Morrison Mahoney, and Attorney Neumeier specifically, to defend Gannett against North Beacon's counterclaims for breaches of contract and fiduciary duty, unjust enrichment, and violation of G.L. c. 93A. The arbitration hearing took place on December 4, 5 and 8, 2017, with closing arguments on March I, 2018. On May 30, 2018, the arbitrator (Neel, J. [ret.]) issued a final decision, awarding $91,699.54.to Gannett on his fee lien claim, but $93,751.90 to North
 
                                                            -2-
 
Beacon on its various counterclaims, resulting in a net judgment to North Beacon of $2,052.36. (See Dkt. No. 166, Joint App. Mots. Summ; J., Vol. I, Ex. 49, Final Award.)
            Gannett and North Beacon each promptly instituted actions in this Court to confirm their respective arbitration awards. See Gallatin River Valley,  LLC  v.  North  Beacon  155  Assocs., LLC, No. 1884CV01634 ("Gannett's Confirmation Action"); North Beacon 155 Assocs., LLC v. Gannett, No. 1884CV01758 ("North Beacon's Confirmation Action"). MLM also provided Attorney Neumeier with a check made payable to North Beacon in the amount of $66,747.62, representing what MLM determined to be the insured portion of North Beacon's arbitration award and leaving $27,004.28 as the outstanding uncovered portion. A dispute then arose between Gannett and Attorney Neumeier concerning Attorney Neumeier's handling of the arbitration and his request for a retainer to represent Gannett in an ongoing disciplinary matter before the Massachusetts Board of Bar Overseers (the "BBO"). See infra. So, Attorney Greenberg replaced Attorney Neumeier as Gannett's legal counsel in the North Beacon Confirmation Action in August, 2018, and thereupon took possession of the check issued by MLM. North Beacon, in turn, moved for summary judgment in its Confirmation Action, which Attorney Greenberg did not oppose on Gannett's behalf. The Court accordingly granted this dispositive motion, thereby confirming the arbitration award in favor of North Beacon and authorizing release of the  escrowed funds to it. See North  Beacon, No.  1884CV01758, Dkt. No.  8 (Mass. Super. Ct. Nov ..16, 2018) (Wilson, J.). North Beacon never accepted the first check MLM issued and, in September, 2019, MLM issued a second check in the same amount ($66,747.62) made payable to Gannett. Gannett cashed this check.
            In the case at bar, Gannett alleges that Attorney Neumeier and Morrison Mahoney negligently represented him in the North Beacon arbitration by, inter alia, failing to prepare and
 
                                                            -3-
 
present proper evidence, failing to conduct adequate cross-examination of adverse witnesses, and failing to seek certain relief from the Superior Court as to the arbitrator's decisions. Gannett has also alleged that Attorney Greenberg neglected to defend him properly and keep him apprised of North Beacon's Confirmation Action. Such negligence is alleged to have included failing to oppose summary judgment or present MLM's first check to the Court, failing to consolidate the action with Gannett's own Confirmation Action, and failing to pursue a claim against MLM for the full amount of North Beacon's arbitration award. Lastly, Gannett has alleged that MLM, his liability insurer, is answerable in damages for failing to supervise Attorneys Neumeier and Greenberg properly and for failing to provide indemnity coverage for the entire arbitration award.
            B. BBO Proceedings - Lee Bank Matter
            On March 23, 2018, the BBO filed a petition for discipline against Gannett arising from his representation of Amaral Enterprises, LLC ("Amaral") and Bearbones, Inc. ("Bearbones").
(See Bar Counsel v. Richard W. Gannett. Esq.• BBO File No. Cl-16-0088.)
            Amaral owned a commercial property where Bearbones operated a bakery.[2] In October, 2012, Amaral and Bearbones obtained loans from Lee Bank in the amounts of $115,000 and $70,000, respectively. In February, 2013, Amaral's property sustained water damage, and Gannett represented Amaral and Bearbones in the resultant insurance claim. At that time, Gannett became aware that any insurance proceeds from the claim were to be held in trust for Lee Bank, as mortgagee. Amaral and Bearbones also entered into a forbearance agreement, drafted by Gannett, which granted Lee Bank sole discretion over how any recovered insurance proceeds would be allocated. In August, 2015, the property insurer issued a check for the
 
--------------------------------------------
 
[2] The factual findings underlying Plaintiff's disbarment are further set forth in In the Matter of Richard W. Gannett SJC-13038 (Mar. 16, 2022).
 
                                                            -4-
 
insurance proceeds made payable to Gannett's law firm, Amaral and Bearbones, and Lee Bank. Over Lee Bank's objections, Gannett deposited the insurance funds into his firm's IOLTA account. Over the next ten months, Gannett wrote nine checks drawn on this IOLTA account, each payable to himself, aggregating to the exact amount of the insurance proceeds.
            The BBO issued its petition for discipline against Gannett concerning the Lee Bank matter while Gannett was awaiting the arbitrator's decision and award in the North Beacon arbitration. Gannett requested that Attorney Neumeier represent him[3] in the BBO proceeding, and Attorney Neumeier demanded a retainer. Gannett declined and instead retained Attorney Greenberg, who entered an appearance in the BBO proceeding on September 4, 2018.
            The BBO held its disciplinary hearings on February 13 and 14, 2019, at which hearings Attorney Greenberg represented Gannett. On June 10, 2019, the BBO Hearing Committee recommended that Gannett be disbarred, and the BBO adopted this recommendation. On November 3, 2020, a Single Justice of the Supreme Judicial Court (Budd, C.J.) entered a judgment disbarring Gannett. See In re: Richard William Gannett, BD-2020-028. Gannett appealed, arguing that he had been denied due process based on the actions and inactions of his counsel, Attorney Greenberg. Chief Justice Budd, and then the full Supreme Judicial Court (SJC), denied these appeals, and affirmed the BBO's decision. See In re: Richard William Gannett. BD-2020-028 (July 12, 2021); In the Matter of Richard W. Gannett, SJC-13038 (Mar. 16, 2022).
            Plaintiff alleges that Attorney Neumeier/Morrison Mahoney improperly requested a retainer as a condition of their engagement, and then left Gannett without counsel before the
 
--------------------------------------------
 
[3] Plaintiff alleges that the BBO initiated this disciplinary action after Attorney Neumeier failed to negotiate a resolution of the underlying bar complaint.
 
                                                            -5-
BBO. He additionally alleges that Attorney Greenberg missed two pre-hearing conferences,[4] neglected to defend Gannett at certain other junctures, and failed to argue or negotiate for a lesser sanction than disbarment.
C. This Action
            Plaintiff filed the present action on April 5, 2021, alleging violations of G.L. c. 93A (Count I), breach of contract (Count 11), and negligence (Count Ill) against all Defendants. and breach of fiduciary duty (Count IV) against Attorneys Neumeier and Greenberg, and against Morrison Mahoney. Defendants moved to dismiss the Complaint in its entirety; and the Court (Squires-Lee, J.) dismissed the c. 93A claims against MLM and Tiegen and the breach of contract claim against Tiegen, but otherwise _denied the motion. (See Dkt. No. 53, Memo. & Order Defs.' Mots. to Dismiss (Dec. 6, 2021).)
            In May, 2023, Defendants served Plaintiff with motions for summary judgment in accordance with Superior Court Rule 9A and the case's then operative scheduling order, arguing, inter alia, that Plaintiff could not sustain his malpractice claims without a supporting expert opinion. On June 15, 2023, Plaintiff filed an emergency motion to enlarge his time to respond to these dispositive motions, noting that he suffered from chronic kidney disease, had undergone a surgical procedure in March, 2023 to insert a dialysis device, and was receiving daily medical treatment because the inserted device was not functioning properly. The Court allowed this motion to extend. (See Dkt. No. 128, Endorsement Mot. Enlarge Time (June. 27, 2023).)
            In August, 2023, Plaintiff served oppositions and cross-motions for summary judgment as to all Defendants, and disclosed for the first time the liability opinion of a recently retained
 
--------------------------------------------
 
[4] Attorney Greenberg contends that he was unable to attend two initial scheduling. conferences due to the fact that he was undergoing bypass surgery, and then other treatment and recovery measures for heart disease, and that he timely notified Bar Counsel of the same. (See Dkt. No. 168, Attorney Greenberg's Statement of Material Facts, Nos. 30- 31.)
 
                                                            -6-
 
expert, Michael G. Watters, Esq. This disclosure triggered the Defendants to file a flurry of reply briefs, oppositions, and motions to strike Attorney Watters' opinion. These filings, in turn, led Plaintiff to request a supplementation of the summary judgment record, to file oppositions to the Defendants' motions to strike - and so on and so forth. The parties' Rule 56 motions and related papers produced nearly forty docket entries, Dkt. Nos. 148-187, and approximately 1,600 pages of exhibits.
FINDINGS OF FACT
            The undersigned presided over a hearing on the parties' Rule 56 and companion motions on January 8, 2024. Gannett attended in-person, as did counsel for each of the respective Defendants.[5]
            At the outset of the hearing, the Court briefly summarized Plaintiff's claims, identifying them as falling into two general categories: (1) claims arising from the North Beacon arbitration; and (2) claims related to the BBO disciplinary proceedings. The parties did not dispute this summary or taxonomy of the pending claims.
            The Court then noted the relatively minor damages at issue in the arbitration-related claims, observing that the entire financial loss to Gannett from such claims (net of amounts paid by MLM as his liability insurer) stood at just $27,000. Gannett agreed, prompting the Court to inquire why claims whose maximum damages (unlike those related to the BBO disbarment proceeding) amount to such a modest sum would warrant the extraordinary amount of time and resources being expended on them. The Court then suggested that the arbitration-related claims might sensibly be resolved, streamlining the litigation to a narrower set of more consequential claims arising out of Gannett's disbarment. (See JA Ex. I, pp. 5:14-6:14.)
 
--------------------------------------------
 
[5] Attorney' Greenberg also attended this proceeding.
 
                                                            -7-
 
            Plaintiff and the Court then proceeded to engage in an extended colloquy concerning the nature and likelihood of Gannett's success on his various claims. As to MLM and Tiegen, the Court suggested that Plaintiff would appear to have difficulty proving direct liability, as an insurance company would not be vicariously liable for the professional malpractice of lawyers whom it engaged. (Id. at p. 9:9-21.) That said, the Court once again questioned Plaintiff about the economic stakes of his arbitration-related claims, which Gannett confirmed were just $27,000.
The Court:       And now there's a deficiency of $27,000. That's what the whole thing [the arbitration] is about.... We can go on and on about whether there's a good claim here or not. I don't see a lot [to it] to be honest with you, but it's $27,000, and- at the most that's on your claim's best day, as to the arbitration. I understand there's more at stake in the BBO.
            Mr. Gannett: That's correct. 
(Id at p.14:11-18.)[6]
            The Court then proposed that the parties consider whether the claims against the insurer and those related to the North Beacon arbitration might be settled. The asserted objective was ''to simplify matters, to get some of the detritus out of [the case,] and let us telescope down to where the case really matters"- viz., the claims related to the BBO's disciplinary proceedings and Gannett's resulting disbarment. (lg,_ at pp. 15:23-16:2.) The undersigned reiterated several times, however, that settlement was at the discretion of the parties, and that the Court was prepared to address all of Plaintiff's claims and the pending motions.
            The Court:       So[,] I'm simply raising the question, is there not a sensible way to skinny the case, before [wading] through an entire course of summary judgment, in order to get to the potential for skinnying the case in a way that would
 
--------------------------------------------
 
[6] The Court also conveyed to Defendants that it was unlikely they would prevail on all claims; at summary judgment based simply on Plaintiffs belated expert disclosure, which was the gravamen of their Rule 56 motions and motions to strike. (See id. at p. 16:5)("... I think the likelihood that the entire case goes poof [on this basis] is very small ....") This, too, was meant to encourage Defendants to consider the wisdom of settlement, at least as to the more modest claims relating to matters unrelated to the BBO proceedings.
 
                                                            -8-
 
be, I think, beneficial to you [Gannett] and certainly beneficial to the Court?
(Id. at p. 8:10-14.)
            The Court:       ... Someone tells me that can't be done, we'll proceed forward.
(Id. At p. 16:3-4.)
            The Court:       .. . [L]ike I said before, I see plenty of chaff[] in here. If people want to talk for three minutes, and then we'll reconvene-I'm happy to deal with the motion[s] root to branch today.
(Id. at p. 17:1-4.)
            Counsel for Greenberg thereupon confirmed on the record the general framework of the Court's settlement suggestion - viz., that the arbitration-related claims be resolved based on their exposure value of approximately $27,000 - and requested a brief recess to discuss the matter.
The Court then recessed the hearing for what turned out to be 16 minutes.
            When the Court went back on the record, counsel for Neumeier and Morrison Mahoney, speaking on behalf of all Defendants, stated, "[I]f Mr. Gannett is willing to take $27,000, [Defendants will] figure out a way among us to get it, we'll carve out the arbitration stuff and then proceed on the other claim[s]," referring to those related to the BBO proceeding. (Id. at pp. 18:7-10.) Counsel for MLM and Tiegen, in turn, noted that this settlement would resolve all claims against her clients. (kt.22:6-13, 23:7-9.)
            The Court again emphasized that resolution of any portion of the case was at the parties' discretion. (See id. at p. 21:15 ("... I'm a public servant. I'll do whatever you tell me to do. ...").)
The Court then inquired of Plaintiff:
            The Court:       Mr. Gannett, what do you think? ...
                                    Let's face it . . . .The BBO is the whole deal for you.
 
                                                            -9-
 
Mr. Gannett:   Of course....
                                    Obviously, this is only about that, really, obviously.
            The Court:       ...  Well, what can we do? Can we put a few words on a piece of paper...?
(Id. at pp. 22:15-23:3.)
            Counsel for MLM and Tiegen thereupon drafted a one-page handwritten statement, memorializing the proposed agreement. It stated in full:
Defendants in this lawsuit (2184CV00789) would agree to do their best to collect $27,000 to offer to Plaintiff, Richard Gannet [sic] for full resolution of:
1) all claims against MLM;
2) all claims against Teigen;
3) all claims against Greenberg, Neumeier and Morrison Mahoney, with the exception of the claims concerning the BBO proceeding[.]
                        Gannet [sic] agrees to accept the $27,000 per the terms above if offered. ("Partial Settlement Agreement", Dkt. No. 188.)
            Plaintiff at this point reviewed the Partial Settlement Agreement, and then addressed the Court. He noted that North Beacon's attorney had submitted the arbitrator's findings to the BBO and, therefore, the arbitration could not be cleaved entirely from the BBO proceedings. The Court then engaged in an exchange with Plaintiff, during which Gannett agreed that North Beacon's submission was not, in fact, central to his BBO-related claims.
            The Court:       Well, I mean, to the extent that the fact of disclosure ties to a different lawyer who's not even part of our case, I guess I have to question "so what?" At the end of the day, your malpractice claims against Messrs. Neumeier and Greenberg have to do with what they did and failed to do in front of the BBO.
            Mr. Gannett:   I agree.
            The Court:       And so there may have been some irreducible consequence to the fact that what happened in front of Judge Neal [sic] went to the BBO, but now we're talking about dominoing things.
            Mr. Gannett:   Yes.
 
                                                            -10-
 
            The Court:       And it seems to me awfully speculative to think that a finding like that was the tripwire to the outcome in your BBO case....
(Id. At p. 28:7-21.)
            The Court then noted that Plaintiff's two sets of malpractice claims appeared to have "very little connectedness," id. at p. 29:10, but again stressed that it was Plaintiffs decision as to whether or not to accept the settlement offer.
            The Court:       So, do we have agreement as to the terms of the partial deal?
            Mr. Gannett:   Well, I have to say reluctantly yes, Your Honor.
            The Court:       Well, you don't have to be reluctant because you don't have to do it at all. I'm not forcing anyone to do anything. telling you what makes sense to me as someone who's done this [] here for 11 years and practiced for 26. This is what I think makes sense now. But I'm not forcing anyone to do anything....
(Id. at p. 30:21-31:7.) Plaintiff, still holding the document memorializing the proposed Partial Settlement Agreement, stated on the record that he accepted the offer.
            Mr. Gannett:   Well, I'll accept [the offer], Your Honor.
            The Court:       Very good. Have it signed and have it filed with the Clerk. ...
(Id. at p. 31:21-23.) Plaintiff and Counsel for each Defendant thereupon signed the Partial Settlement Agreement, which was then filed with the Court and docketed. (See Dkt. No. 188.)
            The Court separately ordered that Defendants be permitted to depose Plaintiffs late- disclosed expert, Attorney Watters, for four hours, with the costs of such deposition to be split evenly between Plaintiff and Defendants. The Court stayed action on the parties' Rule 56 motions, and set a new briefing schedule for the parties to revise and re-file such motions· following the Watters deposition. (See Endorsement on Mot. Nos. 148, 152, 156, 158, and 167 (Jan. 8, 2024).)
 
                                                            -11-
 
            At no point during the January 8 hearing did Gannett indicate to the undersigned (or anyone else in attendance) that he was in any way impaired or unable to understand either the proceedings or the terms of the Partial Settlement Agreement. Gannett was alert and oriented, his eyes were focused, and his speech was clear, intelligible, and not slurred. He did not ask the Court or defense counsel to clarify or repeat any of the discourse. His own statements and answers to the Court's questions were coherent, rational, responsive and appropriate to the subject matter at issue. Gannett demonstrated a comprehensive recall of his claims against each Defendant, and the factual allegations underlying same, referencing published cases by name and even events by date going back several years. He likewise discussed the nature and scope of the settlement agreement and his broader goals for the litigation. Gannett did not disclose or imply that he suffered from any sort of cognitive disability, limitation, impairment, or any other disabling medical condition. At no point during the hearing did Gannett request a recess or any other form of accommodation to consider the settlement proposal further.
            On January 11, 2024, Defendants tendered the conditionally agreed $27,000 to Plaintiff. (See J.A. Ex. 3.) The following day, however, Plaintiff served upon all Defendants (and filed with the Court) a ''Notice" purporting to withdraw his signature and assent from the Partial Settlement Agreement. (See Dkt. No. 189.)[7]
            On January 19, 2024, the Court held a virtual hearing (via Zoom), during which Plaintiff disclosed for the first time that he has stage-five kidney disease that had previously required two hospitalizations and two surgeries. He also stated that he "was not feeling very well" during the
January 8 hearing. (J.A. Ex. 6 at p. 4:9-13.) Plaintiff did not, however, argue that his condition caused him to suffer any cognitive impairment or limitations during the hearing or at any other
 
--------------------------------------------
 
[7] Gannett emphasized at hearing that he had, in fact, prepared this withdrawal notice the prior evening, a fact of no evident significance.
 
                                                            -12-
 
relevant time.
            The Court repeatedly questioned Plaintiff as to the basis for his attempt to withdraw from the Partial Settlement Agreement. In response, Plaintiff argued the perceived merits of his claims and Defendant's purported breach of the agreement. The Court responded that his arguments did not appear to provide any basis for invalidating the parties' signed settlement, which had been agreed to in the presence of the undersigned and filed with the Court. Plaintiff then stated that he "didn't have adequate time" to review the Partial Settlement Agreement. The Court disagreed. Plaintiff then requested additional time to review it, and the Court denied that request. (Id. at pp. 10:22-11:12.) At no time did Plaintiff suggest1n any fashion that his request for additional review time was related to a physical or mental condition or any resultant need for accommodation. Plaintiff did not reference either the Americans with Disabilities Act or any analogous disability statute or regulation.
            On February 5, 2024, Gannett petitioned the Appeals Court for interlocutory relief pursuant to G.L. c. 231, § 118, seeking, inter alia, an order vacating the Partial Settlement Agreement. A Single Justice of the Appeals Court (Ditkoff, J.) denied Gannett's petition. In so doing, the Single Justice noted, "Once the judge issues a written ruling on the enforceability of the settlement agreement, if the plaintiff is unsatisfied, I will entertain a supplemental petition under this docket number, provided that it is filed [timely]." Gannett v. Neumeier, No. 2024-J- 0068 (Mass. App. Ct. Feb. 14, 2024).
            Thereafter, Gannett submitted a letter to this Court from his treating nephrologist, Jessica S. Tangren, M.D., of Massachusetts General Hospital. (J.A. Ex. 17.)[8] Dr. Tangren's letter states
 
--------------------------------------------
 
[8] In an excess of consideration for the Plaintiff's circumstances, viz.,Mr. Gannett having experienced difficulty securing an expert willing to testify on his behalf at hearing, the Court accepted this ordinarily inadmissible hearsay letter into evidence over the Defendants' objection.
 
                                                            -13-
 
that Gannett has end-stage kidney disease (ESKD) requiring dialysis to remove toxins from his body and that, in November, 2023, Gannett underwent surgery to repair a hernia. Dr. Tangren's letter further asserts that studies from the National Institute of Health "show that ESKD negatively impacts executive decision-making."(Id.) Following the surgery, Gannett's dialysis regime was reduced for ten weeks, which resulted in a lessened removal of uremic toxins from his body during the period that included January 8, 2024. According to Dr. Tangren, this "could have negatively impacted Mr. Gannett's executive decision-making."(Id.) More specifically, as to the January 8 hearing, Dr. Tangren's letter states:
Mr. Gannett reports he attended a public meeting where he was required to make an ''on the spot" decision. It is possible given the circumstances above that his executive decision-making could have been compromised as [sic] this time. I suspect he was unaware of this as different individuals react differently to uremic toxin build up.
(Id.) Dr. Tangren further opines that Gannett's request for additional time to evaluate the Partial Settlement Agreement "can be supported by laboratory data which supports that Mr. Gannett had more uremic toxins in his body at this time." (Id.) There is no indication, however, that Dr. Tangren ever reviewed the transcript or audio-recording of the January 8 hearing, or even the text of the Partial Settlement Agreement itself.
            For their part, Defendants submitted a letter and affidavit from Mark G. Parker, M.D., a nephrologist at Maine Medical Center. In this letter, Dr. Parker opines as follows:
While it [sic] possible for a patient with untreated advanced chronic kidney disease or a patient on chronic dialysis therapy with very poor dialysis adequacy to develop severe cognitive impairment, the majority of chronic kidney disease or end stage kidney disease patients have either no cognitive impairment or mild cognitive impairment. To this end, the impact on decision-making is probably, at worst. more on the end of the spectrum of common conditions like fatigue, multi-tasking, etc[.], as opposed to the impact of severe brain injury. Such impairment is probably more evident with new task learning rather than with tasks and processes that are well known and understood by the individuals.
(Dkt. No. 210, Aff. Mark Parker, M.D.) Dr. Parker reviewed Gannett's medical chart, and
                                                            -14-
 
observed that Gannett maintains some underlying natural kidney function (or "residual kidney function") that, along with dialysis, ..were working to remove uremic toxins from his body." (Id.) Dr. Parker acknowledges that Gannett's dialysis fluid fill volumes were decreased following his hernia surgery on November 9, 2023, and that he reported feeling tired on November 30, 2023; but Gannett did not report or display any other typical signs or symptoms of uremia. Clinical-notes on November 22, 2023, December 23, 2023, and January 3, 2023 likewise all described Gannett as "doing well," with no complaints regarding fatigue, concentration or other cognitive difficulties, and otherwise noted normal physical examinations. (Id.) Dr. Parker's letter and affidavit report that "[t]his continued to be the pattern and description of [Gannett's] monthly clinic visits throughout January-May 2024." (Id.) All told, Dr. Parker concludes that "[i]t seems highly improbable that Mr. Gannett was substantially impaired in his understanding or decision-making on January 8, 2024." (Id.)
            At hearing on the present motion, the Court took evidence from just three witnesses. Plaintiff presented two: himself and Attorney Greenberg. Defendants put forward one: Mark Parker, M.D. (whose testimony was presented for the Court's review via videotaped deposition). Plaintiff proffered no live testimony from either a treating or expert nephrologist, and instead relied upon the letter from Dr. Tangren summarized ante and upon his own hearing testimony. In the latter connection, Gannett testified that, although he came to court on January 8th fully· prepared to argue a complex set of summary judgment motions, he in fact "felt confused" at the time he signed the Partial Settlement Agreement on account of what he now understands to be a dialysis-related condition. The Court is not persuaded by this contention, and, belied as it is by the undersigned's own observations, declines to credit it. Indeed, the lone other witness whom Plaintiff called to testify, Attorney Greenberg, recalled observing Gannett at the January 8
 
                                                            -15-
 
hearing, and discerned no signs of distress, confusion, or incompetence of any sort. The Court  credits these observations. 
            For his part, Dr. Parker's deposition testimony entailed a careful review of Gannett's laboratory tests, blood chemistries and clinical notes contained in the treatment records from the days surrounding the January 8 hearing. Dr. Parker testified, credibly, that the medical evidence discloses no basis for concluding that Gannett was suffering any sort of cognitive impairment or deficit at the time he signed the Partial Settlement Agreement. Toe clinical evidence, he opines, is in fact to the precise contrary, testimony the Court credits in its entirety.
DISCUSSION
            "A settlement agreement is a contract and its enforceability is determined by applying general contract law." Dacey v. Burgess, 491 Mass. 311, 318 (2023), quoting Sparrow v. Demonico, 461 Mass. 322, 327 (2012). Thus, the Partial Settlement Agreement at issue in this case is enforceable by Defendants if the parties agreed to be bound by its material terms, Defendants complied with those terms, and Plaintiff had the legal capacity to enter into the agreement. See Massachusetts Mun. Wholesale Elec. Co. v. Danvers, 411 Mass. 39. 47 n.4 (1991) (elements of a contract are legal capacity, offer, acceptance, consideration, and delivery).[9] Plaintiff argues that (1) the Court improperly converted the January 8, 2024 hearing into a mediation; (2) the agreement is too ambiguous to be enforceable; (3) Defendants breached the agreement, and thereby excused Plaintiff from his own performance; and (4) Plaintiff lacked the mental capacity to enter into the agreement. The Court does not agree, and addresses each of
Plaintiff's arguments in turn.
 
--------------------------------------------
 
[9] Plaintiff has not raised a plausible claim of fraud, misrepresentation or duress in connection with the Partial Settlement Agreement. See Boston Med. Cntr. Corp. v. Secretary of Exec. Off. of Health & Human Servs., 463 Mass. 447, 468 (2012) (plaintiff"must []prove[] by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities").
 
                                                            -16-
 
            A. The Partial Settlement Agreement Constitutes a Binding Contract.
            Courts possess inherent power to "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Bower v. Bournay-Bower, 469 Mass. 690,699 (2014) (quotations omitted). This undeniably includes encouraging settlement. See Wong v. Luu, 472 Mass. 208,210 (2015), quoting Graizzaro v. Graizzaro. 36 Mass. App. Ct. 911, 912 (1994) ("A court may appropriately urge settlement on the parties"). Here, the Court repeatedly emphasized that settlement (or partial settlement) was entirely up to the parties, and that the Court was prepared to proceed with their filed motions if no settlement could be reached. The Court noted the greater challenges and costs the parties faced if the case went forward in its entirety, observing, for example, that Defendants' Rule 56 motions were unlikely to resolve all claims in their favor and, conversely, that Plaintiff would have difficulty proving his tort claims against MLM and Tiegen. The parties all agreed that Plaintiff's arbitration-related claims carried an outside exposure of just $27,000, the amount of uninsured financial harm that had come to Gannett in that proceeding.
            It is entirely appropriate, therefore, particularly in these circumstances, for a trial judge to "encourage[] the parties to settle" and "point out the obvious - that ... a settlement could minimize the risk for both parties," discuss the ramifications of"an adverse decision ... , and [inform the parties] that if they did not settle they could always try the case." Smith v. Aghajanian, No. 19-P-858, 2020 WL 3124645, at *2 (Mass. App. Ct. June 12, 2020) (Rule 1:28). A seasoned litigator like Gannett surely is (or should be) aware that it is common practice for trial courts, particularly after the close of discovery, to ask the parties in a civil matter about the prospects of settlement and to caution them about the risks of proceeding to a decision on the
 
                                                            -17-
 
merits. Moreover, "[t]he contemporaneous record demonstrates ,that [the plaintiff] was well aware that he could have rejected the terms proposed and proceeded[.]" Id. There was nothing extraordinary about the turn taken at the January 8 hearing,[10] and Plaintiff's claim that he was somehow surprised or unprepared to discuss settlement at this juncture simply cannot be credited.
            A settlement reported to the Court is enforceable, even where the agreement has not been reduced to writing, so long the words of the parties, the agreement as a whole, and the surrounding facts and circumstances indicate that the parties intended to enter into a binding resolution. Basis Tech. Corp. v. Amazon.com. Inc.• 71 Mass. App. Ct. 29, 41-45 (2008). "[T]he deliberateness and the gravity" of reporting a settlement is considered strong evidence "of the intention of a party ... to be bound by its communication to the opposing party and to the court." Id. at 44. In particular, parties that have completed discovery and engaged in extensive motion practice are presumed to be "informed [ ] of the strengths and weaknesses of their positions and of the wisdom of a compromise." Id. at 43. "Ideally[,] the work will have promoted a rational solution between the parties [and] [i]t should not go to waste by reason of repudiated settlement agreements." Id. at 44. See also Correia v. DeSimone, 34 Mass. App. Ct. 601, 603-04 (1993) (..[T]he integrity of the judicial process ... would be ill served if those intimately involved in that process, litigants, attorneys, and judges, could not rely on declarations of settlement       ").[11]
 
--------------------------------------------
 
[10] Indeed, what the Court encouraged and what the parties agreed to do at this hearing made a great deal of sense for both sides. A complex set of claims and two of the five named Defendants were removed from the case entirely, in consideration for which Plaintiff received what he acknowledged to be 100 cents on the dollar for those claims.
[11] See also Innis v. Innis, 35 Mass.App. Ct. 115, 118 (1993)("Counsel was not at liberty to·let the judgment enter with [the client's] apparent approval and later invite a battle of affidavits about why the judgment should not have entered"); Correia. 34 Mass. App. Ct. at 604 ("The force of oral agreements made in open court and acted on by the court, even in the face of statutory requirements of formality Is:&., the Statute of Frauds] has long been recognized." (internal quotation omitted)); Hubbard v. Peairs, 24 Mass. App. Ct. 372,374,377 (1987) (where parties disclosed in open court that they had reached settlement, ''the [subsequent] writing would serve only as a memorial of an already
 
                                                            -18-
 
            Here, Plaintiff had devoted significant time and travail to oppose and cross-move for summary judgment. He fully understood the claims in issue, how they fit into his larger lawsuit, and what their economic worth was in terms of recoverable damages. At the January 8 hearing, Gannett engaged in a lengthy discussion with the Court regarding the strengths, weaknesses, and monetary value of his arbitration-related claims. He then took a 16-minute recess, and additional time thereafter, to consider both the oral and written proposals tendered to him by Defendants, which were simple and straightforward. Plaintiff did not request any amendments or modifications to the Partial Settlement Agreement. He discussed the scope of its terms, but suggested no changes. He then reported his assent to the Court, on the record, and further confirmed such assent with his signature on an agreement-memorializing document the parties docketed. The record thus plainly demonstrates Plaintiff's intent to be bound by the Partial Settlement Agreement, an intention Gannett cannot now be permitted to repudiate merely because he has had second thoughts about the deal."The civil justice system simply does not work if [courts] allow settled cases to unravel because a party has had ' settlement remorse.,,, A
to Z Integrated Sys. v. Prasad. No. 05CV1791F, 2011 WL 1663078, at *1 (Mass. Super. Ct. Mar. 24, 2011) (Curran, J.).[12]
            Plaintiff argues that the Partial Settlement Agreement is too ambiguous to be enforceable - viz., that his arbitration-related claims cannot be disentangled from his BBO claims, because North Beacon submitted the arbitrator's findings to the BBO. Plaintiff supports this argument
 
--------------------------------------------
 
binding agreement"); Dominick v. Dominick. 18 Mass. App. Ct. 85, 86-89{1984) (once parties indicated to court that they had entered into settlement agreement, agreement became binding even in absence of more formally executed instrument).           ·
[12] Once again, the Court is puzzled by the zeal with which Gannett has sought to renounce this settlement. The agreement streamlined the case in a way beneficial to the party bearing the burden of proof, gave up nothing more than a few claims that were questionable on their face, and yielded Gannett the maximum damages he could have recovered had the claims been tried successfully. Such a resolution was hardly unfair to Plaintiff.
 
                                                            -19-
 
with a citation to an email-letter he received from Attorney Greenberg in June of 2019, in which Greenberg reported that the BBO was resistant to resolving its case against Gannett with anything less than disbarment because of the "cumulative effect" of  the  multiple complaints against him. These complaints presumably included Judge Neel's findings in the North Beacon arbitration that Gannett had committed ethical violations. The Court, however,  addressed  this very issue with Gannett during the parties' January 8 hearing. Specifically, the Court observed that the purported tie between the two categories of claims appeared rather tenuous as a legal matter, see ante; and thus, by accepting the settlement, Plaintiff would only be forfeiting a strained theory that what occurred in the North Beacon arbitration somehow had a causal connection to his disbarment.[13] Plaintiff' s repetition of this argument here does not change the fact that the BBO proceedings were not "rooted in [the] arbitration," as he groundlessly insists. (See Pl.'s Opp . Mot. Enforce Settlement at 10). More important, Plaintiff cannot credibly claim that the scope of the Partial Settlement Agreement is so ambiguous as to be unenforceable, where the very issue he now raises to suggest ambiguity was specifically addressed (to Gannett's "reluctant" if not enthusiastic satisfaction) before he assented to the settlement. See Basis Tech., 71 Mass. App. Ct. at 36-38 (settlement not void due to ambiguity or indefiniteness "simply because" the release terms are categorical and "parties have developed different interpretations of them"; party with "actual or chargeable knowledge" of proposed term "should have investigated [it]... to its satisfaction before [] agree[ing] to [settle]. If [party] remained
 
--------------------------------------------
 
[13] The connection is dubious because, irrespective of Attorney Greenberg's surmise about the BBO's motivations, Gannett's disbarment resulted from the fact that he siphoned money improperly from a client's IOLTA account. What did or did not occur during the North Beacon arbitration would seem highly collateral to this discipline, whether the BBO was aware of it or not. Indeed, there is no indication that either the BBO or the SJC so much as considered any aspect of the arbitration in addressing Plaintiff's disbarment. In fact, the sole reference to the arbitration in any of the Gannett disciplinary decisions was in response to Plaintiff' s allegation that Attorney Greenberg had mishandled the North Beacon Confirmation Award, which the SJC disregarded outright as an "unrelated case." In th Matter of Richard W. Gannett. SJC-13038, slip op. at *2 (Mar. 16, 2022).
 
                                                            -20-
 
genuinely suspicious, it could have declined that settlement term or the settlement altogether").
            Plaintiff's companion argument that the Partial Settlement Agreement should be construed against MLM as the "drafter" is without merit. Counsel for MLM merely happened to be the scrivener 'who reduced the parties' oral agreement to a one-page writing. As noted above, an oral settlement reported to the Court is fully enforceable even in the absence of a written agreement; and this is what occurred here. The writing was a belt and-suspenders memorialization of the parties' agreement, and requires no "construction." Furthermore, this was not an elaborate insurance policy or some other species of contract of adhesion. It was a straightforward settlement of specified claims the parties had discussed, and Plaintiff was a trained lawyer with decades of experience. The doctrine of contra proferentem has no application here.[14]
            Lastly, Plaintiff's argument that MLM's hand-written draft somehow deviated from the oral offer originally tendered to him is baseless. The record reflects that the writing was entirely consistent with the offer stated in open court, and Plaintiff did not then and has not since identified any actual discrepancies between the two.
            For all of these reasons, the Partial Settlement Agreement is an enforceable contract.
B. The Defendants Did Not Breach the Agreement.
            The plain language of the Partial Settlement Agreement recites that the Defendants would "do their best to collect $27,000 to offer to Plaintiff," and Plaintiff "agree[d] to accept the $27,000 per the terms [] if offered." (See Dkt. No. 188.). Defendants issued such an offer on January 11, 2024, at which point their promised performance - and the lone condition to
 
--------------------------------------------
 
[14] Even if the doctrine did apply, it would merely mean that an ambiguous term should be construed against the drafter, not that the entire agreement is unenforceable altogether. Here, the only term of the contract pertaining to MLM (whose counsel put ink to paper) is wholly unambiguous - "full resolution of ... all claims against MLM[.]" (See Diet. No. 188.)·
 
                                                            -21-
 
Plaintiffs counter-promise to dismiss the referenced claims - was fulfilled. (See J.A. Ex. 3.)
            Plaintiff adopts an everything-but-the-kitchen-sink approach to argue that Defendants have somehow breached the Partial Settlement Agreement. None of these arguments, however, persuade. Plaintiff first contends that he should be released from the agreement because MLM and Tiegen did not contribute to the costs of Attorney Watters' deposition, and the remaining
Defendants did not contribute to the costs of Attorney Watters' preparation time. This argument reflects a tortured and nonsensical interpretation of the Court's order regarding the Watters' deposition.[15] Regardless, the allocation of costs for the deposition of Plaintiff's expert is wholly unrelated to the terms of the Partial Settlement Agreement and to Defendants' performance thereunder. Plaintiff cannot seriously argue otherwise.
            Plaintiff next argues that the Court found that MLM had breached its insurance contract, and that this finding - somehow - renders the parties' settlement a nullity. Plaintiff's assertion is both factually incorrect and legally without consequence. Rather than find a breach, the Court expressed its very strong doubt as to the merit and value of Plaintiff's claims against MLM, stating explicitly: "I haven't seen anything in this [that] makes really any sense in terms of claims against the insurer"; and $27,000 in all events represents Plaintiff's "best day, as to the arbitration." (J.A., Ex. 1 at pp. 9:9-11, 14:15-16.) Further, even if the Court had indicated that Plaintiff had a winning claim that MLM in some manner breached the insurance policy - which
 
--------------------------------------------
 
[15] The Court ordered that the expenses associated with  this expert's  deposition, including  the related mechanical costs (stenographer, transcript, etc.), would be shared - 50%by Plaintiff and 50% by Defendants (collectively). The Court made no order as to how the five Defendants would allocate these costs among themselves; nor did it suggest that Plaintiff would somehow be entitled to payment from each individual Defendant. The unmistakable purpose of the order was to assure that the two sides of the "v" in this case shared the costs of a discretionary expert deposition (necessitated by Gannett's untimely disclosure) on an equal basis. That said, it was entirely reasonable for MLM and Tiegen, having an agreement in hand that required the dismissal of all claims against them, to decline to participate or contribute to the costs of the deposition. But this is obviously of no moment to Gannet/, who is in all events assured of paying no more than half of such costs. Furthermore, and as the Court expects anyone of Plaintiff's experience to know, a standard order for deposition costs does not include the witnesses ' preparation time. See Mass. R. Civ. P. 54(e).
 
                                                            -22-
 
the Court plainly did not do - that has no bearing whatsoever on whether Defendants upheld their end of the Partial Settlement Agreement. Parties in litigation settle claims that are clear winners, clear losers, and everything in between, and nothing about the relative merits of a resolved claim bears in any way on an alleged breach of the settlement thereof.[16] Every claimant alleges some form of wrongdoing or liability on the part of the defendant(s). It is a reason that parties agree to settle in the first place, and not a reason to undo the settlement agreements themselves.
            In the case at bar, the Court has at no time made "findings" against MLM or Tiegen. Plaintiff agreed to settle all of his claims against them for a specifically stated amount. Toe fact that Gannett believes he would have prevailed on these claims at trial is not a reason to set aside the Partial Settlement Agreement or to conduct a separate damages assessment as to MLM and Tiegen. Plaintiff's argument for avoiding the parties' settlement on this ground simply makes no
sense.
            Contrary to Plaintiff's next contention, the collateral source doctrine has no bearing on either the enforceability of the Partial Settlement Agreement or Defendants' performance thereof. The collateral source doctrine provides that "compensation received from a third party unrelated  to a tortfeasor-defendant . . . will not diminish an injured party's recovery from that tortfeasor." Short v. Marinas USA Ltd. P' ship, 78 Mass. App. Ct. 848, 857 n.10 (2011) (emphasis added), quoting Fitzgerald v. Expressway Sewerage Constr., Inc., 177 F.3d 71, 73 (1st Cir. 1999). But
 
---------------------------------------------
 
[16] Likewise, the fact that Plaintiff's claims of direct liability against MLM and Tiegen survived a motion to dismiss does not establish"law of the case"; nor does it affect the enforceability of the Partial Settlement Agreement. Dkt. No. 53, Memo. & Order Defs.' Mot. Dismiss, slip op. at "'8 (discussing Plaintiff's single allegation of direct liability as satisfying the, lannacchino standard). As covered in any first-year civil procedure course, and unlike in the precincts of Rule l2(b), a party may not defeat a Rule 56 motion merely by resting on the allegations in his pleading. Mass, R. Civ. P. 56(e) ("[A]n adverse party may not rest upon the mere allegations or denials of his pleading."). Regardless, the relative merits of Plaintiff's claims have no bearing on whether Gannett settled those claims and whether Defendants performed their obligations under the agreement.
 
                                                            -23-
 
MLM is plainly not a third party unrelated to a tortfeasor-defendant; MLM is, rather, one of the named Defendants. MLM (if found liable at trial) would be statutorily entitled to a setoff against any judgment for the funds it already paid, G.L. c. 231B, and any windfall recovery Plaintiff might conceivably have received from the other Defendants would be subject to MLM's subrogation rights. See Bunker Hill Ins. Co. v. G.A. Williams &  Sons. Inc.,  94 Mass. App. Ct. 572, 574 (2018). Plaintiff effectively acknowledged the same on January 8 when be conceded in open court that the net value of his arbitration-related claims, "on their best day," was approximately $27,000. (See J.A., Ex. 1 at p. 14:11-18.) In all events, the collateral source doctrine concerns setoffs on a judgment of tort liability. See Jones v. Wayland, 374 Mass. 249, 262 (1978). The doctrine in no way prohibits Defendants from settling a case for something other than the total amount they would be required to pay if found liable.[17] Plaintiff's invocation of the collateral source doctrine, generously construed, represents little more than a belated challenge to the valuation of his potential damages. But just as Plaintiff's dispute over the relative merit of his underlying claims does not establish a breach of the settlement agreement. neither does a purported dispute over the scope of his recoverable damages.
            The fact that MLM does not intend to pay the entirety of the settlement amount on its own, and that other Defendants do intend to contribute, similarly reflects no breach of the Partial Settlement Agreement. The plain language of the agreement states that the "Defendants," plural, would "agree to do their best to collect $27,000 to offer to Plaintiff (Dkt. No. 188.) There is no requirement that MLM pay the entire settlement amount, or any portion of it, by itself. The requirement is simply that Gannett be disbursed the $27,000 he agreed to accept, and the underlying source of the funds themselves is immaterial to him.
 
--------------------------------------------
[17] Likewise, a settlement is not void or breached merely because the defendants do not compensate the claimant for pre- or post-judgment interest, or provide any other forms of recovery that would be incident to a judgment.
 
                                                            -24-
 
            Defendants likewise did not breach the Partial Settlement Agreement by requesting that Plaintiff provide it his Social Security number and date of birth. The Superior Court's decision in Cook v. Rettman, No. 20071520, 2008 WL 5505477 (Mass. Super. Ct. Dec. 23, 2008), which Plaintiff inexplicably .relies upon, acknowledges an insurer's legitimate need for such information. See id. at *l ("[Insurer] satisfied its statutory obligations [to report a settlement payment] when it notified the Department of Revenue of the pending settlement payment and provided [the plaintiffs] name, address, date of birth, and social security number."),  citing G.L. c. 175, § .24F.Disclosure of a payee's date of birth and Social Security number is a common precondition to the issuance of settlement payments, and a practice with which Gannett is surely familiar.[18]
            For all of these reasons, the Court finds that Defendants committed no breach of the Partial Settlement Agreement they seek to enforce. Plaintiff's contrary arguments are meritless.
C. Plaintiff Has Not Demonstrated a Lack of Contractual Capacity.
            Plaintiff argues that he lacked the mental capacity to enter into the Partial Settlement Agreement, and was relatedly denied a reasonable accommodation to his disability under the Americans with Disabilities Act (ADA). The Court does not agree.
            A settlement agreement "is voidable by a person who, due to mental illness or defect, lacked the capacity to contract at the time of entering into the agreement." Dacey. 491 Mass. at 318, quoting Sparrow, 461 Mass. at 327. "[T]he burden is _on the party seeking to void the contract to establish that (he] was incapacitated at the time of the transaction." Dacey, 491 Mass . at 318, quoting Sparrow. 461 Mass. at 327. Under the "traditional" test, contractual incapacity
 
--------------------------------------------
 
[18]      G.L. c. 175,§§ 24D, 24E, 24F (requiring insurer, prior to making nonrecurring payment in excess of$500 to claimant, to ascertain whether claimant owes child support, public benefits, or taxes to Commonwealth, such as, by providing Commonwealth with notice of payment and claimant's "name, address, date of birth and social security number ... ").
 
                                                            -25-
 
exists where a party is "incapable of understanding and deciding upon the terms of the contract.'' Sparrow, 461 Mass. at 328, quoting Wright v. Wright. 139 Mass. 177, 182w83 (1885) (Holmes, J.). This requires "overwhelming" evidence of mental incapacity. Sparrow, 461 Mass. at 329 n.10. Alternatively, under the so-called "modern" test, a  party must show that, although  he has some understanding of the nature and consequences of  the  transaction; "by  reason of  mental illness or defect, [the person] is unable to act in a reasonable manner in relation to the transaction and the other party has reason to know of his condition." Id. at 329, quoting Krasner v. Berk, 366 Mass. 464,468 (1974). Thus, under the modem test, a party must show that his mental limitation caused him to enter into an agreement that "no reasonably competent person would have entered into," and the other party had reason to know of his compromised condition. Id. at 329, 334.[19] Medical evidence or expert testimony is necessary to show that an individual's "mental condition interfered with [his] understanding of the transaction [under the traditional test], or [his] ability to act reasonably in relation to it [under the modem test]." Id. at 323.
            As set forth ante, the Court acknowledges the statements of Drs. Tangren and Parker that, at certain levels, uremic toxins - if not sufficiently processed via dialysis and/or natural kidney function - may impair an individual's cognition and negatively impact his executive decision-making. However, the record in the present case does not remotely suggest that Gannett in fact experienced such deficits during th": January 8 hearing, or at any other proximate time. Dr. Tangren's letter merely notes that Gannett's dialysis regime was reduced following his November, 2023 hernia surgery and. therefore, that "[i]t is possible given the circumstances
 
--------------------------------------------
 
[19] For example, in Sparrow, the SJC held that the parties' settlement agreement was enforceable because, "even if [the defendant] suffered from a transient mental defect, or 'breakdown' ... she had at least some understanding of the nature of the transaction and was aware of its consequences. Under the modem test ... the evidence was similarly insufficient. There was no evidence that the settlement agreement was unreasonable, or that a reasonably competent person would not have entered into it." 461Mass. at 334.
 
                                                            -26-
 
above that his executive decision-making could have been compromised”' during the hearing. (J.A. Ex. 17 [emphasis added].) Such a patently speculative suggestion does not carry Plaintiff's burden of proof under any test of capacity. See Sparrow, supra.[20]
            Further to the above, there is no indication  that Dr. Tangren  reviewed  the transcript or audio recording of the January 8 hearing, or reached any factually informed conclusion as to the likelihood that Gannett was in fact unable to understand the settlement offer or act reasonably in response to it. The only objective evidence of Gannett's condition that Dr. Tangren referenced was that "laboratory data supports that [he] had more uremic toxins in his body at this time." (J.A. Ex. 17.) Dr. Tangren did not, however, quantify, date, or further identify this data; and, more significantly, she did not suggest that a heightened level of uremic toxins necessarily rendered Gannet unable to act reasonably or understand the terms of the agreement (or were even appreciably likely to do so). The lone theoretical statement about uremic toxins that Dr. Tangren does make is manifestly insufficient to constitute a definite opinion that Gannett lacked the capacity to enter into a one page contract. See Rivera-Flores v. Bristol-Myers Squibb Caribbean, 112 F.3d 9, 13 (1st Cir. 1997) ("Mere evidence of diagnostic labels ... is inadequate to create an issue as to the consequences of the disorders on an individual's capacity to give valid consent."). For his part, by contrast, Dr. Parker opined that "the majority of chronic [ ] or end stage
 
--------------------------------------------
 
[20] See also Marston v. United States. No. CIV.A. 10-10437 -GAO, 2012 WL 4529940; at 22 (D. Mass. Sept. 30, 2012) ("[M]ental capacity to contract ... only requires that the person be in such possession of his faculties as to enable him to know at least what he is doing and to contract understandingly. If a deeper understanding were necessary to render a person competent to settle a lawsuit, few settlement agreements entered into by non-lawyers would be enforceable." (internal quotations and citations omitted)); Citizens Bank of Mass. v. Kuzinevich, No. 99- 2320-G, 2003 WL 25897068 (Mass.Super. Ct. Sept. 24, 2003) (Ball, J.) (promissory note enforceable despite lawyer's history of mental illness, including depression. borderline personality disorder, suicidality, delusions hospitalizations; at the time he signed note, lawyer was highly functioning and practicing in complicated area of law, and psychiatrist testified his mental health issues did not interfere with his intelligence or cognitive functioning); Crupi v. Crupi, 784 So. 2d 611, 614 (Fla. Dist. Ct. App. 2001) (holding that evidence party was very upset and anxious at mediation conference, took three Xanax pills, and felt personally pressured to sign mediated agreement,
was insufficient to warrant setting aside agreement; "Otherwise, few, if any, mediated settlement agreements :would be enforceable." ).
 
                                                            -27-
 
kidney disease patients have either no cognitive impairment or mild cognitive impairment ... like fatigue," and that such impairment as does exist is less evident ''with tasks and processes that are well known and understood by the individuals." (0kt. No. 210, Aff. Mark Parker, M.D.) Here, although Gannett's dialysis regime was decreased in November, 2023, there is no indication reflected in any of his months of medical records thereafter that Gannett experienced any diminished mental capacity.[21] Dr. Parker expounded this opinion persuasively during his videotaped testimony. Dr. Parker thus examined Gannett's laboratory test results, blood chemistries,   and the clinical notes contained in this patient's medical records in the days proximate to the January 8 hearing. Based on a careful review of this data, Dr. Parker concluded that, contrary to the speculative possibility raised by Dr. Tangren, there were no facts in the medical evidence to indicate that Gannett was, in actuality, suffering any sort of cognitive dysfunction at the time that would have impaired his executive decision-making. To the contrary, all of the data analyzed by Dr. Parker were "reassuring" to the conclusion that Gannett was in fact functioning well and was not clinically impaired at all. The Court fully credits Dr. Parker's testimony, and adopts his conclusions.
            Further to the above, Plaintiff's actual presentation before the undersigned on January 8 belies his current claim of incapacity. A court may rely on its own observations and direct knowledge of events in evaluating a party's competency and capacity. See Commonwealth v.
 
--------------------------------------------
 
[21] Cf. Lau Mass. Bus. Trust v. Bender No. 1581CV0107,42015 WL13856588, at*7 (Mass. Super. Ct. Oct. 10, 2015) (Salinger, J.) ("[A]llegations that [defendant] ... had  diabetes, needed  a  heart operation  and  round the  clock care, and his  wife had recently  passed away do not  ...   suggest that [he] was  not  mentally competent to  enter into [ ] contract. The capacity to contract requires ... the ability to understand the nature and quality of the transaction and to grasp its significance . . .  It does not require that one be physically healthy or not be grieving."); Marston, 2012 WL 4529940, at • 10, 24 (plaintiff did not establish lack of capacity, despite physician's testimony that he suffered traumatic brain injury and post-concussion syndrome, as well as possible anoxic brain injury, and suffered from constant headaches, poor memory and concentration, and problems with equilibrium; there was "no information in the records [to] assist th[e] court in determining how [these] complaints translate[d] into the plaintiff's cognitive ability to enter into an agreement.").
 
                                                            -28-
 
Corbett, 98 Mass. App. Ct. 34, 38-39 (2020); Adoption of Igor, 22-P-l138, 2023 WL 5566356 at *2 (Mass. App. Ct. Aug. 23, 2023) (Rule 23.0). See also Commonwealth v. Scionti, 81 Mass. App. Ct. 266, 273 (2012){"The judge is [ ] entitled to place great weight on her own communications with the [party] and observations and reports of his behavior because ultimately competency is based on the defendant's functional abilities."). As set forth ante, Gannett was lucid and coherent at the January 8 hearing. He spoke in a normal tone of voice, without any inordinate delays, slurs or other indications of deficit. His responses were rational, reasoned, and appropriate. He stood throughout much of the hearing, and did not display any imbalance or fatigue. He never indicated that he felt unwell, and never requested a recess prior or subsequent to the one the Court granted to the parties at its own initiative. Gannett engaged in an extended dialogue with the Court as to the merit of his claims, demonstrating a thorough understanding of their legal and factual underpinnings. He spontaneously referenced both appellate precedent and prior decisions of the Court in this matter, and discussed specific communications with Attorney Greenberg from years prior. He likewise participated in impromptu negotiations over the terms of the Watters' deposition and the allocation of its costs, including advocacy with defense counsel that he should contribute a lesser share. The Court discerns not a hint of the mental incapacity Gannett now asserts in support of his plea that the Partial Settlement Agreement be set aside.
            The Court has given fair consideration to the testimony put forward by Gannett at hearing, to the effect that, on January 8, he was suffering physical conditions that rendered him incapable of appreciating the full implications of the Partial Settlement Agreement he was being asked to sign. However, because such obviously self-serving testimony finds no support in Gannett's medical records, is refuted by the only persuasive expert testimony presented, and is
 
                                                            -29-
 
flatly inconsistent with the first-hand observations of both another percipient witness and the undersigned, the Court has not credited it.
            As to the Partial Settlement Agreement itself, the essential terms were suggested to Gannett before a 16-minute recess. Defendants then orally tendered the terms of settlement to Gannett, and reduced them to a brief writing for his review. Gannett was then afforded additional time - indeed, all the time he indicated he needed - to consider the Partial Settlement Agreement. The agreement itself was plainly worded, and consisted of just a few lines of straightforward prose. Gannett did not in any way suggest that he did not understand the terms. To the contrary, he reflected on his decision, specifically identified a potential stumbling block when delineating his two sets of claims, and then engaged in a substantive exchange with the Court regarding same. Finally, Gannett clearly expressed his acceptance of the settlement terms, both orally and with his signature on the memorializing document.[22]
            Thus, under the traditional test, Plaintiff has not met his burden to show that he was "incapable of understanding and deciding upon the terms of the contract[.]" Sparrow, 461 Mass. at 328 (quotation omitted). Plaintiff has likewise not satisfied the "modem" test by showing that he was "unable to act in a reasonable manner in relation to the transaction," and that Defendants had "reason to know of his condition." Id. at 329 (quotation omitted). The settlement was clearly not unreasonable. To the contrary, it approximated a best-case scenario for Plaintiff's arbitration- related claims. Additionally, nothing in the record suggests that Defendants had reason to know Plaintiff might be suffering from a mental problem. Indeed, nothing in Gannett's own medical record suggests such a cognitive deficit. That Plaintiff had requested an extension of time to
 
--------------------------------------------
 
[22] Cf. Wright v. Marjem Recovery, LLC. No. C.A. 13-12058-TSH,2014 WL 4274528, at •6  (D. Mass. Aug. 27, 2014)(mortgage enforceable although signatory reported memory Joss two years later and was diagnosed with dementia four years after signing; signatory indicated at the time that she understood the mortgage, and no one present observed any behavior that indicated otherwise).
 
                                                            -30-
 
respond to his adversaries' Rule 56 motions in March, 2023, due to a temporary need for daily kidney treatment, is obviously not a reason for Defendants to question his mental status ten months later. Particularly where Plaintiff engaged in a wide-ranging and vigorous motion practice in the interim.
            Plaintiff's ADA claims fail for similar reasons. When a litigant requests accommodation and the court determines the litigant has a disability, the court is required to provide reasonable accommodations, such accommodations to be fashioned on case-by-case basis. See Commonwealth v. Heywood, 484 Mass. 43, 47 (2020); Adjartey v. Central Div. of the Hous. Court Dep't, 481 Mass. 830, 848-849 (2019).[23] A disability is defined in relevant part as "a physical or mental impairment that substantially limits one or more major life activities[.]"42 U.S.C. § 12102(l)(A). Accord G.L. c. 151B, §· 1(17).[24] "Major life activities" include but are not limited to "caring for oneself, performing manual tasks, seeing, hearing, ...  speaking, ... learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(1)(A). Accord G.L. c. 151B, § 1(20). To establish a violation of the ADA for failure to accommodate, Plaintiff must show that (I) the court had notice of his disability; (2) he timely requested an accommodation; and (3) the accommodation was reasonable and linked to the limitations of his disability. See Jones v. Nationwide Life Ins. Co. 696 F.3d 78, 89 (1st Cir. 2012) ("This means not only notice of a condition, but of a causal connection between the major life activity that is limited and the accommodation sought." (quotation omitted)). See also In re ·
 
--------------------------------------------
 
[23] See also 42 U.S.C. § 12133 (2006) (setting forth "remedies, procedures, and rights" available "to any person. alleging discrimination on the basis of disability in violation" of Title TI of ADA); Tennessee v. Lane, 541 U.S. 509, 533.34 (2004) (holding ADA Title II applies to state courts to ensure "fundamental right of access to the courts").
[24] General Laws c. 93, § 103 extends the Massachusetts Equal Rights Act to require that individuals with disabilities not be "excluded" from "participation in" the programs or activities of the court by "reason of' their disability. In re McDonough, 457 Mass. 512, 518 (2010) (applying both art. 114 and Title II of ADA).
 
                                                            -31-
 
McDonough, 457 Mass. 512,523 (2010), citing Shedlock v. Department of Corr., 442 Mass. 844, 856 (2004) (it is " incumbent" on a plaintiff alleging art. 114 or ADA violation "to request accommodation in the first instance"); Reed v. LePage Bakeries, Inc., 244 F.3d 254,260 (1st Cir. 2001) (under ADA, "a person normally must make a specific request for the modification in question"). See also Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 465 (4th Cir. 2012) (defendant ''was not obligated to accommodate (plaintiff] until he provided a proper diagnosis [ ] and requested specific accommodation"(quotations omitted)).
            Here, Plaintiff fails to satisfy any of the criteria for asserting an ADA violation. While end-stage kidney disease may in some circumstances qualify as a disability, there is (for the reasons stated above) no evidence that this condition substantially limited Gannett' s cognitive abilities in the present case. As such, Plaintiff has not shown any link between a mental impairment and the accommodation he argues should now be extended to him- viz., nullification of his acceptance and additional time to review the Partial Settlement Agreement. See Jones, supra. See also Ortiz-Martinez v. Fresenius Health Partners. PR. LLC, 853 F.3d 599, 605 (1st Cir. 2017) ("[B]urden is on [plaintiff] to demonstrate in the first instance what specific accommodations [he] needed and how those accommodations were connected to [his] [dis]ability"); Axelrod v. Phillips Acad., Andover, 46 F. Supp. 2d 72, 84 (D. Mass. 1999) (math waiver held not reasonable accommodation for plaintiff's ADHD, where there was no evidence of math learning disability).
            Additionally, Plaintiff did not request any accommodation or provide notice of any purported mental impairment either at or before the January 8 hearing. Even at the subsequent January 19 hearing, Plaintiff merely stated that he "was not feeling very well" during the prior hearing. (J.A. Ex. 6 at p. 4:9-13.). Later during the January 19 hearing, Plaintiff asked to
 
                                                            -32-
 
withdraw his assent and be given additional time to consider the Partial Settlement Agreement. (See id. at pp. I0:22-11:12.) This, again, was insufficient to provide actual or constructive notice of a claimed disability, and cannot fairly be construed as a request for accommodation for the Court to even consider for reasonableness. See McDonough, 457 Mass. at 523 ("judge will be in no position to [ ]determin[e] whether any accommodation is,' reasonable ' unless the judge is informed ...  of the need for a particular accommodation"). Indeed, Plaintiff did not invoke the ADA or  raise the  issue of a disability-related accommodation  until more  than  three  months after the settlement hearings. (See Dkt. No. 195.) Given the strong public policy favoring enforcement of settlements reported to the courts, Plaintiff's familiarity and presumed understanding of the gravity of such agreements and reportage, Defendants' justifiable reliance on the Partial Settlement Agreement as they proceeded with expert discovery, and Plaintiffs ongoing failure to establish any significant cognitive limitation, a belated request for accommodation is neither reasonable nor adequately linked to any demonstrated impairment.
            For all of these reasons, Plaintiff did not lack capacity to enter into the settlement agreement, and was not denied reasonable accommodation for his belatedly claimed disability. As such, the Partial Settlement Agreement is enforceable against him.
CONCLUSION AND ORDER
            For all the foregoing reasons, Defendants' Motion to Enforce Settlement is ALLOWED. Plaintiff is directed to provide Defendants with his Social Security number and date of birth within five (5) days of this Order, if not previously provided. Defendants, in turn, shall treat this information in strict confidence, disclosing it to no one without a bona fide need to know. In accordance with the terms of the Partial Settlement Agreement, (1) all claims against MLM; (2) all claims against Teigen; and (3) all claims against Greenberg, Neumeier and Morrison
 
                                                            -33-
 
Mahoney, with the exception of those concerning the BBO proceeding, shall be DISMISSED upon notice to the Court that Defendants have paid the stipulated settlement amount to Plaintiff.
SO ORDERED.